**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**February 23, 2004**

Charles R. Fulbruge III
Clerk

Revised March 12, 2004

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 02-20834
_____


DRESSER-RAND COMPANY

Plaintiff-Appellee-Cross-Appellant,


VERSUS


VIRTUAL AUTOMATION INC, ET AL.

Defendants

APIX, INC., a Florida Corporation; DENNIS C. MEZZATESTA,
Individual; CHRIS TSIPOURAS, Individual

Defendants-Appellants-Cross-Appellees
_____

consolidated with
_____

No. 03-20417
_____


DRESSER-RAND COMPANY

Plaintiff-Appellant,


VERSUS


VIRTUAL AUTOMATION INC, a Texas Corporation, ET AL.

Defendants

DENNIS C. MEZZATESTA, Individual

Defendant-Appellee

Before DeMOSS, DENNIS, and PRADO, Circuit Judges

DeMOSS, Circuit Judge:

Dennis Mezzatesta, Apix, Inc., Chris Tsipouras and others were found by a jury to have acted fraudulently, breached contracts, and misappropriated confidential information relating to industrial control systems developed by Dresser-Rand. All of the parties filed various post-trial motions, each of which were denied by the district court. Apix appeals the denial of its motion for judgment as a matter of law or for a new trial on Dresser-Rand's misappropriation claim. Tsipouras appeals the denial of his motion for judgment as a matter of law or for a new trial on Dresser-Rand's fraud claim. Mezzatesta appeals the denial of his motion for judgment as a matter of law or for a new trial on Dresser-Rand's fraud and breach of contract claims. Finally, Dresser Rand cross appeals: 1) the district court's denial of its motion for judgment as a matter of law on its breach of contract claim against Apix; and 2) the district court's denial of its motion for injunctive relief against Apix and Mezzatesta.

## BACKGROUND & PROCEDURAL HISTORY

Dresser-Rand supplies industrial control products and services worldwide. Specifically, Dresser-Rand manufactures compressors and

turbines for large industrial applications such as oil and gas operations. Dresser-Rand also makes its own control products that regulate the turbines, compressors, and other machinery it sells. In 1996, Dresser-Rand hired Dennis Mezzatesta to join its controls business. At the time Mezzatesta was hired by Dresser-Rand, most industrial operations had two types of control systems: one for the machinery and another to control the balance of the plant's operations. Although Dresser-Rand had previously only sold machinery control systems, it planned to enter the plant or "process" control market. Dresser-Rand and Mezzatesta set out to develop a new type of control system, through the "Trax" project, that could perform both the machinery and plant control functions. To protect the confidential information related to Trax, Dresser-Rand required its employees to sign confidentiality agreements. In particular, Mezzatesta was required to sign a "Code of Conduct," pledging to protect the company's confidential information and avoid conflicts of interest.

Mezzatesta was responsible for overseeing the Trax project, including the negotiation of supply agreements for the hardware and software components that were to make up the control system. Mezzatesta recommended to Dresser-Rand that Apix, Inc., was the best hardware supplier for the project. Subsequently, in January 1999, Dresser-Rand entered into a supply and distribution contract with Apix to create a hardware component that would meet the Trax product specifications. The contract granted Dresser-Rand the

3

exclusive right to sell products containing the Apix hardware in a defined "Area of Application," which involved primarily new machinery control systems.[1] Apix also gave Dresser-Rand the non-exclusive right to sell control products using the Apix hardware in all other markets worldwide.

Because Apix would have access to the Trax specifications developed by Dresser-Rand and other proprietary information, the contract contained provisions intended to impose a confidential relationship between the parties.[2] Chris Tsipouras, acting in his capacity as an officer of Apix, signed the contract acknowledging

---

[1] In exchange for the exclusive right to sell Apix hardware in the "Area of Application," the contract imposed upon Dresser-Rand minimum purchase obligations of $750,000 for the first year of the contract, $1,000,000 for the second year, $1,500,000 for the third year, and $2,000,000 for the fourth and any following years.

[2] The relevant confidentiality provisions state, in pertinent part:

> WHEREAS, APIX and Dresser-Rand mutually agree that Dresser-Rand has expended valuable time and expenses, and has provided valuable Dresser-Rand confidential information and trade secrets in order for APIX to create products in a form factor specific to the DIN Rail industry, the sale of which will result in additional sales of APIX products; and
> WHEREAS APIX to its benefit is in possession of, or has become privy to, valuable Dresser-Rand trade secrets, and recognizes Dresser-Rand's need to control or protect the sale and distribution and
> WHEREAS, the parties have agreed to a mutually cooperative arrangement intended to provide customers with the best technical solution and to increase the sales of both the parties' respective products, while protecting the respective parties [sic] property (including intellectual property) and under which Dresser-Rand will obtain certain rights of use and sale in an Area of Application. . . .

4

that Dresser-Rand was entrusting Apix with trade secrets and other confidential information.

Unknown to Dresser-Rand, on the same day that Apix signed the contract with Dresser-Rand, Apix signed another contract with Virtual Automation, a company that had been formed by Mezzatesta and another associate for the purpose of marketing a controls product that could simultaneously perform machinery and process controls. Formed while Mezzatesta was still working for Dresser-Rand, Virtual Automation was to use hardware that was substantially the same as the hardware Apix sold to Dresser-Rand.

In July 2000, Paul Fairbanks, Mezzatesta's supervisor at Dresser-Rand, discovered the existence of Virtual Automation when he picked up a piece of paper trash in the Dresser-Rand parking lot. The scrap of paper turned out to be a Virtual Automation price list for what appeared to Fairbanks to be Trax items. Fairbanks immediately initiated an investigation. After learning of Fairbank's discovery, Mezzatesta resigned, taking with him electronic data relating to the Trax project. Upon his resignation from Dresser-Rand, Mezzatesta immediately began working for Apix, where he continues to work today.

During his investigation, Fairbanks inquired as to Tsipouras's knowledge of Virtual Automation. Tsipouras denied having done any business with Virtual Automation. However, it was discovered that Tsipouras had not only signed a contract with Virtual Automation, but was also a stockholder in the company, holding a seat on

Virtual Automation's board of directors.

In August 2000, Dresser-Rand filed suit in state court for injunctive relief to prevent Virtual Automation and others from cloning its product. After non-suiting the case, Dresser-Rand filed suit in October 2000 in United States District Court for the Southern District of Texas against multiple defendants, including Apix, Mezzatesta, and Tsipouras. Dresser-Rand asserted various claims against the defendants including, among others, RICO, trade secret misappropriation, common law misappropriation, fraud, and breach of contract. Apix counterclaimed that Dresser-Rand had breached its contract with Apix.

After a three and one-half week trial, the jury found for Dresser-Rand on its common law misappropriation claim against Apix, on its fraud claims against Tsipouras and Mezzatesta, and on its breach of contract and civil theft claims against Mezzatesta. The jury also found that Dresser-Rand breached its contract with Apix and awarded Apix $130,000 in damages and $100,000 in attorney's fees. The jury awarded Dresser-Rand compensatory damages on its fraud and misappropriation counts in the amount of $2.2 million, the value of its lost development costs. The jury also awarded $317,000 against Mezzatesta for breach of his employment contracts with Dresser-Rand and civil theft. In addition, the jury assessed punitive damages in the amount of $1,650,000 against Mezzatesta, $550,000 against Tsipouras, and awarded Dresser-Rand $900,000 in attorney's fees. On April 29, 2002, the district court entered

judgment on the verdict.

Shortly after judgment was entered, Apix, Tsipouras, and Mezzatesta filed motions for judgment as a matter of law, to amend the judgment, or for a new trial. In addition, Dresser-Rand filed a motion seeking injunctive relief against Apix. On July 15, 2002, the district court denied all parties' pending motions. Subsequently, on July 22, 2002, Apix, Tsipouras, and Mezzatesta filed their notices of appeal. Dresser-Rand filed its notice of cross-appeal on August 5, 2002.

## STANDARD OF REVIEW

We review de novo a district court's ruling on a motion for judgment as a matter of law. Miss. Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 365 (5th Cir. 2002). However, when an action is tried by a jury, such a motion is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. Brown v. Bryan County, OK, 219 F.3d 450, 456 (5th Cir. 2000), cert. denied, 532 U.S. 1007 (2001). Accordingly, we consider the evidence, "drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." Id. This Court grants great deference to a jury's verdict and will reverse only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.

7

Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 497 (5th Cir. 2002). A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence. Id.

We review the denial of a motion for new trial for abuse of discretion. Miss. Chem. Corp., 287 F.3d at 365; Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1049 (5th Cir. 1998) ("Absent a clear showing of an abuse of discretion, we will not reverse the trial court's decision to deny a new trial.").

Finally, the denial of injunctive relief is reviewed under an abuse of discretion standard, while the legal conclusions underlying the denial are subject to de novo review. Waco Int'l, Inc. v. KHK Scaffolding Houston, Inc., 278 F.3d 523, 528-29 (5th Cir. 2002).

## DISCUSSION

**I.   Whether the district court erred in denying Apix's motion for judgment as a matter of law or for a new trial on Dresser-Rand's misappropriation claim.**

On appeal, Apix contends that it did not misappropriate Dresser-Rand's product because: 1) Dresser-Rand never had a finished product; 2) Apix never made a product with features Dresser-Rand planned to include in its proposed product; 3) Apix never sold its own product that Dresser-Rand claimed was a Trax "clone;" and 4) Apix simply planned to combine its own hardware with publicly available software that Dresser-Rand neither made nor

8

planned to use in the future, which Apix claims is not misappropriation.

The elements of a cause of action for unfair competition by misappropriation in Texas are: "(i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff." United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc., 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied).

Taking these elements and each of Apix's arguments in turn, we first look at Apix's claim that Dresser-Rand never had a finished product. Apix contends that because the Trax project was never completed, there was no final product to misappropriate. This Court, however, has previously determined that the Texas misappropriation law is "specially designed to protect the labor—the so-called 'sweat equity'—that goes into creating a work." Alcatel USA, Inc., v. DGI Techs., Inc., 166 F.3d 772, 778 (5th Cir. 1999). It appears from the evidence presented at trial that Dresser-Rand expended substantial time and expense towards the Trax project. As Dr. Stephen Carr, an expert witness, testified, "Dresser-Rand came up with the plan to do the product, the specifications for the product, . . . and that's where the essence

9

of a product is, in the work, in the contribution of Dresser-Rand." Based on this Court's previous interpretation of what is protected under state misappropriation law and the evidence elicited at trial, it appears clear that a final product is not required before it can be misappropriated, and therefore, Apix's first argument fails.

Second, Apix argues that it never made a product using features Dresser-Rand planned on using in the Trax product. Apix again bases its argument, in part, on the premise that it could not have used features from the Trax product because the Trax features were unfinished at the time of trial. However, there is evidence that Apix planned to use the Trax technology to create a competing control product to be sold through Virtual Automation. Specifically, exhibits presented at trial demonstrated the similarities between the Trax product and Virtual Automation's product materials, including the manner in which the products were marketed. In addition, expert testimony revealed that the differences between the Dresser-Rand and Apix control products were only superficial. As such, there was sufficient evidence presented at trial supporting the jury's conclusion that Apix used technology features associated with the Trax product in its own control system products.

Third, Apix claims it never sold its own product, and therefore, it did not "use" it in competition with Dresser-Rand. Currently, there are no published cases interpreting the term "use"

10

as that term is applied in the Texas common law definition of misappropriation. However, there is an analogous argument that the term "use," as defined in the common law tort of misappropriation, includes activities other than the actual selling of the product. For example, in <u>Forscan Corp. v. Dresser Indus., Inc.</u>, 789 S.W.2d 389, 395 (Tex. App.—Houston [14th Dist.] 1990, writ denied), a case involving the misappropriation of trade secrets with facts resembling those present here, the defendant made an argument similar to Apix's, specifically arguing that it had not made commercial use of the misappropriated information.[3] However, the Texas Court of Appeals rejected this argument, finding that the defendant's attempts to market the product satisfied the commercial use requirement.[4]

In this case, there was testimony that Mezzatesta and Apix were already taking orders for sales of the "clone" product even before Mezzatesta resigned from Dresser-Rand. In addition,

---

[3] To prove misappropriation of trade secrets, a plaintiff must show: 1) the existence of a trade secret; 2) a breach of a confidential relationship or improper discovery of the trade secret; and 3) use of the trade secret without authorization. <u>Guy Carpenter & Co., Inc. v. Provenzale</u>, 334 F.3d 459, 467 (5th Cir. 2003).

[4] Specifically, the <u>Forscan</u> court found that:
[The defendant] himself stated that in 1981 he was in the process of both testing his tool and attempting to market it. He had employed a marketing director who was conducting a marketing survey and contacting prospective customers. Clearly, this is evidence of intended commercial use.
<u>Forscan</u>, 789 S.W.2d at 395.

11

evidence proffered at trial revealed that Apix and Mezzatesta were prepared to give away the product to gain the competitive advantage of entering the new control market before Dresser-Rand. It is undisputed that Apix was actively marketing its competing product at least six months before trial. Therefore, based on Apix's marketing activities and the fact that it was already taking product orders, we find that Apix did in fact "use" the Trax technology.

In its fourth argument, Apix claims that it simply planned to combine its own hardware with publicly available software that Dresser-Rand neither made nor plans to use in the future. However, as discussed previously, the evidence presented at trial indicated that Dresser-Rand, not Apix, was responsible for coming up with the idea for the control system, investing the time, labor, skill, and money to design the specifications, modify the existing hardware and software components, and conduct the alpha testing of the product.

In sum, there is sufficient evidence to affirm the district court's order denying Apix's motion for judgment as a matter of law or for a new trial on Dresser-Rand's misappropriation claim.

## II. Whether the district court erred in denying Chris Tsipouras's motion for judgment as a matter of law or for a new trial on Dresser-Rand's fraud claim.

On appeal, Tsipouras contends that Dresser-Rand failed to produce evidence supporting its claim that Tsipouras intended to

12

allow Virtual Automation to sell Apix hardware in competition with Dresser-Rand. Tsipouras argues that in its contract with Virtual Automation, Apix expressly <u>prohibited</u> Virtual Automation from selling the hardware in Dresser-Rand's "Area of Application," and therefore, cannot be liable for fraud. Dresser-Rand responds by pointing to the fact that on the same day Tsipouras signed the contract with Dresser-Rand giving Dresser-Rand non-exclusive rights to sell the hardware worldwide and exclusive rights to sell the hardware in Dresser-Rand's Area of Application, Tsipouras also signed a distributorship agreement with Virtual Automation giving Virtual Automation exclusive worldwide rights to distribute the same hardware, including in Dresser-Rand's Area of Application.

Based on a review of the two contracts, they cannot be reconciled. Although Tsipouras claims to have prohibited Virtual Automation from selling hardware in Dresser-Rand's Area of Application, the relevant contract provision expressly states that Virtual Automation "shall not sell <u>to</u> Dresser-Rand, it's [sic] subsidiaries and affiliates in the Area Of Application." (Emphasis added). Therefore, Virtual Automation still appears to have the right to compete with Dresser-Rand in its Area of Application as long as Virtual Automation sells to buyers <u>other</u> <u>than</u> Dresser-Rand. This right conflicts with the <u>exclusive</u> right granted by Tsipouras on behalf of Apix to Dresser-Rand.

Based on the fact that the contract between Dresser-Rand and Apix directly conflicts with the distributorship agreement between

13

Virtual Automation and Apix, and that both contracts were signed by Tsipouras on behalf of Apix on the same day, the evidence is sufficient to support the district court's denial of Tsipouras's motion for judgment as a matter of law or for a new trial on Dresser-Rand's fraud claim.

**III. Whether the district court erred both in allowing Dresser-Rand's expert to testify on lost profits and in denying Apix's and Tsipouras's motion for judgment as a matter of law on the issue of lost profits.**

Apix and Tsipouras argue that the district court erred in allowing the testimony of two witnesses called by Dresser-Rand in support of its lost profits damage theory — Dr. Meherwan Boyce, called as an industry expert, and Mr. Thomas Jollay, an accountant. At trial, Dr. Boyce estimated the market penetration that Dresser-Rand's Trax product would have had, and Mr. Jollay opined that, based on Dr. Boyce's estimate, Dresser-Rand suffered lost profits in the amount of $25 million. Apix and Tsipouras contend that under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the district court improperly admitted Dr. Boyce's testimony as "scientific knowledge." Apix and Tsipouras address in detail the Daubert factors, arguing that Dr. Boyce's estimates should be excluded.

In response, Dresser-Rand insists that the lost profits analysis is irrelevant because it had no impact on the judgment. Dresser-Rand argues that the jury rejected the lost profits analysis and instead only awarded Dresser-Rand its $2.2 million

14

development costs. In addition, Dresser-Rand asserts that a Daubert challenge cannot support reversal because, at most, admission of the testimony at issue would amount to harmless error.

The district court's determination of admissibility of expert evidence under Daubert is reviewed for abuse of discretion. St. Martin v. Mobil Exploration & Producing U.S., Inc., 224 F.3d 402, 405 (5th Cir. 2000) (citing Moore v. Ashland Chem., 151 F.3d 269, 274 (5th Cir. 1998) (en banc)). Erroneous admission of expert testimony is subject to a harmless error analysis. St. Martin, 224 F.3d at 405; United States v. Matthews, 178 F.3d 295, 304 (5th Cir. 1999). Moreover, pursuant to Fed. R. Civ. P. 61, this Court is bound to disregard any errors, including the admission of expert testimony, that do not affect the substantial rights of the parties. Bell v. Swift & Co., 283 F.2d 407, 409 (5th Cir. 1960). The burden of proving substantial error and prejudice is upon the appellant. Id.

Even if the district court erred in allowing Dresser-Rand's witnesses to testify concerning lost profits, this testimony had little or no effect on the jury's verdict. The jury awarded Dresser-Rand only its $2.2 million development costs and divided that amount among three defendants — $1,100,000 against Mezzatesta, $550,000 against Tsipouras, and $550,000 against Apix. Testimony at trial revealed that Dresser-Rand's development costs and claim for lost profits were distinct and separable from one another. In addition, the jury charge specifically makes a distinction between

15

compensatory damages and lost profits. The jury appears to have taken into account the testimony of Dr. Boyce and Mr. Jollay, evaluated the validity of the lost profits analysis, and subsequently rejected that analysis. Therefore, because the jury did not award Dresser-Rand any of its lost profits claim, even if the district court erred in admitting the lost profits testimony, such error would be harmless.

**IV.  Whether the evidence at trial conclusively established that Apix incurred $2,760,000 in damages in addition to the $130,000 awarded by the jury for Dresser-Rand's breach of its contract with Apix.**

The jury found that Dresser-Rand breached its contract with Apix by retaining certain hardware components provided by Apix without remitting payment. Apix claims that although the jury correctly determined that Dresser-Rand breached its contract with Apix and awarded Apix $130,000 for failing to pay Apix for the hardware Dresser-Rand received, the contract also imposed minimum purchase obligations on Dresser-Rand.[5] Specifically, Apix argues that at the time of trial Dresser-Rand failed to purchase $2,760,000 of Apix hardware as required by the contract. Apix asserts that it invested $300,000 to upgrade its manufacturing

_____

[5] The minimum purchase obligation provision of the contract states that "[d]uring the first four years and future years of the Agreement, Dresser-Rand shall purchase the minimum purchase requirement for such years as set forth in Exhibit A," which requires Dresser-Rand to purchase Apix hardware in the following amounts: $750,000 in the first year, $1,000,000 for the second year, $1,500,000 for the third year, and $2,000,000 for the fourth and any future years.

16

capabilities so that it could produce the quantities Dresser-Rand agreed to purchase.  In addition, Apix maintains that by focusing on its contract with Dresser-Rand and giving up on other business opportunities, it was severely damaged.

Dresser-Rand insists that the minimum purchase provisions in its contract with Apix were not intended to go into effect until the Trax product was complete.  Paul Fairbanks, the manager of Dresser-Rand's control system operations, also testified that Dresser-Rand's minimum purchase obligations were directly tied to Dresser-Rand's exclusive right to purchase, use, and sell Apix's hardware in Dresser-Rand's Area of Application.  In other words, according to Dresser-Rand, to maintain its exclusive right granted by Apix, Dresser-Rand had to purchase the minimum quantities as set forth in the contract.[6]

In the absence of an error of law, this Court reviews the district court's award for damages for clear error only. In re Liljeberg Enters., Inc., 304 F.3d 410, 447 (5th Cir. 2002).  If the award of damages is plausible in light of the record, a reviewing court should not reverse the award even if it might have come to a different conclusion. Id. (quotation marks and citation omitted). At the conclusion of the trial, the jury found that Dresser-Rand breached its contract with Apix.  In awarding damages, however, the jury determined that Dresser-Rand was only liable to Apix for

---

[6] It is undisputed that at the time of trial Dresser-Rand failed to meet any of the minimum purchase obligations.

17

$130,000, the value of the Apix hardware that Dresser-Rand received but did not pay for. As for Dresser-Rand's minimum purchase obligations, the jury instructions specifically inquired as to the amount of money, "if any, . . . [that] would fairly and reasonably compensate Apix for its damages, if any, that were proximately caused . . . [by] Dresser-Rand's failure, if any, to meet its minimum purchase obligations under the contract." The jury answered this question by awarding Apix nothing.

Apix fails to provide this Court with any compelling reason to overturn the jury's damage award for Dresser-Rand's breach. Additionally, given that the jury also found that Tsipouras, an Apix officer, was liable for defrauding Dresser-Rand on the same contract, the determination that Apix should not benefit under the minimum purchase obligation provision is certainly appropriate. Thus, the minimum purchase obligation damage award, or lack thereof, was not clear error.

**V.    Whether the district court erred in denying Mezzatesta's motion for judgment as a matter of law or for a new trial on Dresser-Rand's fraud and contract claims.**

Mezzatesta argues that Dresser-Rand produced no evidence that his alleged fraud or breach of contract caused Dresser-Rand injury, i.e., damage. Mezzatesta recognizes that Dresser-Rand alleged two different types of damages at trial — lost profits and lost investment. Mezzatesta contends that both of these damage theories were premised on Dresser-Rand's claim that Mezzatesta used Virtual

18

Automation to "clone" the Trax product.  He argues, however, that because the evidence at trial established that Virtual Automation never made a product, Dresser-Rand never suffered damages, and therefore, its fraud and breach of contract claims fail as a matter of law.

   1.   Fraud

Among the essential elements of fraud is a showing of injury suffered because of the fraud. C & C Partners v. Sun Exploration & Prod. Co., 783 S.W.2d 707, 718 (Tex. App.—Dallas 1989, writ denied).  The absence of this element will prevent recovery for fraud. Id.  The measure of damages in a fraud case is the actual amount of the plaintiff's loss that directly or proximately results from the defendant's fraudulent conduct. Tilton v. Marshall, 925 S.W.2d 672, 680 (Tex. 1996).   The desired end is actual compensation for the injury, not lost profits. C & C Partners, 783 S.W.2d at 719.

Based on evidence presented at trial, Dresser-Rand determined that its Trax product was going to be preempted in the new controls market by Mezzatesta's fraudulently-acquired product by at least six to eight weeks.  Therefore, because this preemption would effectively cause Dresser-Rand to lose its profitability, it abandoned the Trax project, incurring investment costs up to that time.  Alternatively, Dresser-Rand presented evidence that it would have suffered damages even if it had attempted to continue with the Trax project.  Specifically, there was evidence that Dresser-Rand

19

had tried but was unable to locate suitable substitute hardware from a new vendor. Dresser-Rand also established that it had budgeted neither the funds nor the time to start the Trax project over with a new hardware supplier. Therefore, although Mezzatesta and Virtual Automation did not ultimately complete and sell an end product that they could have placed in direct competition with Dresser-Rand's, the evidence supports the jury's conclusion that Mezzatesta's fraudulent acts caused Dresser-Rand to prematurely withdraw from the market, thereby suffering the loss of its investment costs.

### 2. Breach of Contract

Mezzatesta also argues that this Court should reverse the district court's denial of his motion for judgment as a matter of law or for a new trial on Dresser-Rand's breach of contract claim. Again, the sole basis for Mezzatesta's appeal on the breach of contract issue is his contention that Dresser-Rand did not suffer injury. The jury found that Mezzatesta breached his fiduciary obligations imposed by his employment contract with Dresser-Rand by using Virtual Automation as a vehicle to clone Dresser-Rand's Trax product. As part of his employment agreement with Dresser-Rand, Mezzatesta assigned all rights to any inventions or designs that he made, conceived or created, either solely or jointly with others that related to Dresser-Rand's business "directly or indirectly," or that were developed using Dresser-Rand's materials or facilities. In addition, Mezzatesta agreed to "keep secret and

20

confidential" Dresser-Rand's confidential information, both during his employment and afterward.

Mezzatesta also signed a "Code of Conduct" whereby he acknowledged that he was required to "protect . . . confidential and trade secret information." Pursuant to the Code of Conduct, he agreed to avoid situations in which his personal interests conflicted with those of Dresser-Rand, including holding an interest in any company that might become either a competitor or a supplier of Dresser-Rand.

The damages suffered by Dresser-Rand as a result of Mezzatesta's breach of contract are similar in nature to the damages Dresser-Rand suffered because of Mezzatesta's fraud. We find that there was sufficient evidence to allow the jury to make a reasonable determination of Dresser-Rand's damages as a result of Mezzatesta's breach of contract, and we conclude that the jury award is not clearly erroneous.[7]

**VI. Whether the district court erred in denying Dresser Rand's motion for judgment as a matter of law on its breach of contract claim against Apix.**

At the close of Apix's case-in-chief and before the case went to the jury, counsel for Dresser-Rand orally moved for judgment as

---

[7] Mezzatesta also argues that the district court erred by entering judgment for punitive damages against him because there was no evidence that Dresser-Rand suffered actual damages. Because there is sufficient evidence that Dresser-Rand suffered actual damages on both its fraud and breach of contract claims, Mezzatesta's argument regarding punitive damages and attorney's fees necessarily fails as well.

a matter of law on its breach of contract claim against Apix, which the district court immediately denied. The issue went before the jury, which ultimately determined that Apix did not breach its contract with Dresser-Rand. On its cross-appeal, Dresser-Rand cites two reasons in support of its contention that Apix breached its contract when it assigned distributorship responsibilities to Virtual Automation. First, Dresser-Rand maintains that its contract with Apix clearly prohibits Apix from appointing a third party, such as Virtual Automation, to act as a distributor <u>within</u> Dresser-Rand's Area of Application. Second, Dresser-Rand argues that the plain language of the contract expressly precludes Apix's grant to Virtual Automation of the exclusive right to resell the hardware <u>outside</u> Dresser-Rand's Area of Application.

In response, Apix argues that the notion that its appointment of Virtual Automation violates its contractual obligation to protect Dresser-Rand's confidential information ignores Apix's contentions that: 1) the jury found Dresser-Rand had no trade secrets; 2) nothing in the contract prohibited Apix from using Virtual Automation as a distributor; 3) the obligations to protect Dresser-Rand's information only applied within Dresser-Rand's Area of Application — which is where Apix claims it prohibited Virtual Automation from selling; and 4) Apix's decision to employ Virtual Automation as a distributor was its standard business practice. As detailed below, none of these defenses appear meritorious.

The issue before us is governed by basic principles of

contract interpretation. It is well settled that courts must enforce the unambiguous language in a contract as written, and the applicable standard is the objective intent evidenced by the language used, rather than by the subjective intent of the parties. Petula Assocs., Ltd. v. Dolco Packaging Corp., 240 F.3d 499, 504 (5th Cir. 2001) (quotations omitted). Only after a court has determined that a contract is ambiguous can it consider the parties' interpretations. H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co., 150 F.3d 526, 529 (5th Cir. 1998).

1. Appointing a third-party distributor within Dresser-Rand's Area of Application

We must determine whether Apix's distributorship assignment with Virtual Automation violated the express terms of Apix's contract with Dresser-Rand. Section 1.03 of the Dresser-Rand/Apix contract states:

> In order to protect the Dresser-Rand confidential and trade secret information contained in the HARDWARE:
>
> In circumstances that involve or are within Dresser-Rand's Area of Application,
> (a) APIX shall not sell or appoint, allow, or permit any other party to sell the HARDWARE, and,
> (b) APIX shall refer all requests to Dresser-Rand for inquiries on, or orders for, the HARDWARE in circumstances that involve or are within Dresser-Rand's Area of Application.[8]

Apix's first argues that there can be no breach because the

_____

[8] With regard to section 1.03(b), Dresser-Rand asserts that it is undisputed that none of its management knew that Apix had assigned distributorship responsibilities to Virtual Automation, or that Virtual Automation was privy to any of the Trax specifications.

23

jury determined at trial that Dresser-Rand had not proven that the technology associated with the Trax project was a trade secret. Although this may be a correct statement, section 1.03 specifically states that the contract is intended to protect "<u>confidential</u> <u>and</u> trade secret information" contained in the Trax product. (Emphasis added). Therefore, although Dresser-Rand did not persuade the jury that it had a protectable trade secret, it nevertheless drafted a contract that also protected confidential information.[9]

Apix next argues that nothing in the contract prohibited it from using Virtual Automation as a distributor. However, it appears that section 1.03(a) expressly contemplates and prohibits such an assignment by specifically precluding Apix from appointing any other party to sell the hardware within Dresser-Rand's Area of Application. Meanwhile, the relevant provision in the Apix/Virtual Automation distributorship agreement expressly states that Virtual Automation "shall not sell <u>to</u> Dresser-Rand, it's [sic] subsidiaries and affiliates in [Dresser-Rand's] Area Of Application." (Emphasis added). Therefore, Virtual Automation still appears to have the right to compete with Dresser-Rand in its Area of Application as long as Virtual Automation sells to buyers <u>other</u> <u>than</u> Dresser-Rand. This provision in the distributorship agreement directly conflicts with section 1.03(a)'s prohibition on the creation of third-party assignments in Dresser-Rand's Area of Application. Therefore,

---

[9] It is noteworthy that the jury did find Apix liable for unfair competition by misappropriation of confidential information.

based on basic principles of contract interpretation, Apix's second argument fails.

Third, Apix argues that the obligation to protect Dresser-Rand's information only applied <u>within</u> Dresser-Rand's Area of Application. However, as discussed above, Apix failure to satisfy that obligation renders this argument meritless. In other words, the distinction Apix attempts to make between its obligations in and out of the Area of Application would succeed only if it successfully protected Dresser-Rand's information in the first place. Finally, Apix's fourth argument, that its decision to employ Virtual Automation as a distributor was its standard business practice, has no relevance to this discussion.

Finding no merit in any of Apix's four arguments, we conclude that Apix failed to satisfy its contractual obligations relating to its duties within Dresser-Rand's Area of Application.

2. <u>Exclusive right to resell Apix hardware outside Dresser-Rand's Area of Application</u>

Dresser-Rand's second assertion on its cross-appeal is that there is contradictory language between the contracts regarding the right to resell the hardware <u>outside</u> Dresser-Rand's Area of Application. Apix first assigned Dresser-Rand the "<u>non-exclusive</u> right to use and to purchase and resell the said APIX hardware in a form factor specific to the DIN Rail industry to all customers in all markets worldwide." (Emphasis added). Immediately thereafter, Apix granted Virtual Automation the "<u>exclusive</u> right to distribute

25

the said HARDWARE . . . in the DIN Rail Market."[10] (Emphasis added). Simply stated, Apix's non-exclusive grant to Dresser-Rand and the contemporaneously-granted exclusive right to Virtual Automation within the same market do not appear to be reconcilable.

Finding no ambiguous language between the Dresser-Rand/Apix contract and the Apix/Virtual Automation distributorship agreement, we conclude that Apix breached its contract with Dresser-Rand as a matter of law. Therefore, we reverse the district court's denial of Dresser-Rand's motion for judgment as a matter of law and remand with instructions to the district court to determine damages, if any, for Dresser-Rand as a result of Apix's breach.

**VII. Whether the district court erred in denying Dresser-Rand's motion seeking injunctive relief against Apix and Mezzatesta.**

At the conclusion of the trial, Dresser-Rand filed a motion with the district court requesting injunctive relief against both Apix and Mezzatesta. Specifically, Dresser-Rand sought to enjoin Apix and Mezzatesta from manufacturing, marketing, offering for sale, or selling any electronic control product containing features developed by Dresser-Rand for the Trax project. The district court denied Dresser-Rand's motion for injunctive relief and Dresser-Rand cross-appealed the district court's denial.

Dresser-Rand cites three reasons why the district court erred

---

[10] The hardware referred to in both contracts was found by the jury to be the same.

in denying its motion for a permanent injunction against Apix. First, Dresser-Rand maintains that the district court failed to comply with Fed. R. Civ. P. 52(a), which Dresser-Rand claims requires findings of fact and conclusions of law to be entered with respect to the grant or denial of an injunction. Second, Dresser-Rand argues that this Court should reverse the district court's denial of injunctive relief because the fully developed record establishes that a denial under the facts constitutes an abuse of discretion. Third, Dresser-Rand suggests that because Mezzatesta filed for bankruptcy before the jury's verdict, the damages subsequently awarded by the jury were virtually eliminated, leaving Dresser-Rand without an adequate remedy at law.

1.   Applicability of Rule 52(a)

Taking Dresser-Rand's arguments in turn, we first address whether Rule 52(a) compels the district court to make specific findings of facts and state its conclusions of law. As stated previously, the district court did not make any express findings of fact or conclusions of law supporting its denial of injunctive relief. Although Rule 52(a) does require a district court to make such findings and state its conclusions, these requirements are only imposed when a trial is heard without a jury or when a court is issuing an interlocutory order. Dresser-Rand's request for a permanent injunction at the conclusion of a jury trial does not trigger this rule. Therefore, as Rule 52(a) has no application under the facts of this case, Dresser-Rand's first argument on its

27

appeal for injunctive relief fails.

2.   <u>Whether the district court abused its discretion.</u>

Dresser-Rand also argues that the district court abused its discretion in denying Dresser-Rand's motion for injunctive relief. A trial court abuses its discretion if it "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning injunctive relief." <u>Peaches Entm't Corp. v. Entm't Repertoire Assoc.</u>, 62 F.3d 690, 693 (5th Cir. 1995).

At common law, for a permanent injunction to issue the plaintiff must prevail on the merits of his claim and establish that equitable relief is appropriate in all other respects. <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n.12 (1987) (recognizing that the standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success).  A party seeking a permanent injunction must also plead and prove an irreparable injury for which no adequate remedy at law exists. <u>Butler v. Arrow Mirror & Glass, Inc.</u>, 51 S.W.3d 787, 795 (Tex. App.—Houston [1st Dist.] 2001, no pet.).  For purposes of injunctive relief, an adequate remedy at law exists when the situation sought to be enjoined is capable of being remedied by legally measurable

28

damages. <u>Haq v. America's Favorite Chicken Co.</u>, 921 S.W.2d 728, 730 (Tex. App.—Corpus Christi 1996, writ dism'd w.o.j.).

In this case, Dresser-Rand was successful on its claim that Apix misappropriated confidential information associated with the Trax product and that Mezzatesta acted fraudulently and breached his contract with Dresser-Rand. Dresser-Rand also established by its own trial testimony that its claim of $25 million in lost profits would have provided it fair and proper compensation. In other words, according to Dresser-Rand's arguments at trial, any harm that it might have suffered as a result of Apix's and Mezzatesta's wrongful actions could be adequately cured by calculable monetary damages. Additionally, Dresser-Rand conceded at trial that it abandoned the Trax project after learning of Apix's misappropriation. Arguably, it would be difficult for Dresser-Rand to claim it would suffer irreparable injury if Apix were to manufacture, market, offer for sale, or sell any electronic control product containing features similar to Dresser-Rand's Trax product when Dresser-Rand has withdrawn its product from that market.

3.    <u>Mezzatesta's Pre-Verdict Filing for Bankruptcy</u>

In its third argument, Dresser-Rand argues that injunctive relief is proper because Mezzatesta has essentially eliminated the damages awarded against him when he filed for bankruptcy prior to the jury's verdict. The jury awarded Dresser-Rand a total of $3,967,700 in damages against Mezzatesta. However, prior to the

jury's verdict, Mezzatesta filed a voluntary Chapter 13 bankruptcy petition in the Bankruptcy Court for the Southern District of Texas.  In his original bankruptcy schedules, Mezzatesta scheduled general unsecured claims of $124,164.03, exclusive of the $3,967,700 claim in favor of Dresser-Rand.  Pursuant to his original Chapter 13 Plan of Reorganization, Mezzatesta proposed to pay unsecured creditors an aggregate distribution of $426.70.  According to Dresser-Rand's calculations, its pro rata share of the distribution would total no more than $413.77.  Dresser-Rand argues that these circumstances preclude it from having an adequate remedy at law, rendering an injunction appropriate.[11]

As previously discussed, a plaintiff can prove there is no adequate remedy at law where damages cannot be calculated. Haq, 921 S.W.2d at 730.  In addition, there is no adequate remedy at law if the defendant is incapable of responding in damages. Texas Indus. Gas, 828 S.W.2d at 533; Bank of the Southwest N.A., Brownsville v. Harlingen Nat'l Bank, 662 S.W.2d 113, 116 (Tex. App.--Corpus Christi 1983, no writ).  The Texas Court of Appeals has concluded that "insolvency can be a factor in determining whether there is an adequate remedy at law." Texas Indus. Gas, 828 S.W.2d at 533

---

[11] Dresser-Rand originally filed a motion for injunctive relief against both Apix and Mezzatesta.  However, due to Mezzatesta's bankruptcy and the correlating automatic stay, Dresser-Rand voluntarily withdrew its motion for injunctive relief.  Two months later, the district court denied all post-trial motions and the parties filed their respective notices of appeal and cross-appeal.  Thereafter, the bankruptcy court lifted its stay to allow Dresser-Rand to seek injunctive relief against Mezzatesta.

(emphasis added).

    4.   <u>Analysis</u>

Based on a review of the parties' respective arguments, we conclude that the district court did not abuse its discretion in denying Dresser-Rand injunctive relief. We first observe that by its own argument, Dresser-Rand has calculable damages, <u>i.e.</u>, its $25 million lost profits claim. Damages capable of being measured afford Dresser-Rand an adequate remedy at law, thus precluding injunctive relief. Second, also by its own admission, Dresser-Rand has completely abandoned the Trax project, thus eliminating any irreparable harm it might incur as a result of any similar product that Apix and/or Mezzatesta may or may not introduce into the market. In the absence of such harm, the granting of injunctive relief is not appropriate. <u>See</u> <u>Butler</u>, 51 S.W.3d at 795. Finally, although Mezzatesta may not be capable of paying the damages awarded Dresser-Rand by the jury, this factor is but one we may consider in making our determination. <u>Texas Indus. Gas</u>, 828 S.W.2d at 533. The first two factors discussed above, <u>i.e.</u>, Dresser-Rand's calculable damages and the abandonment of its Trax project, weigh far greater in our analysis as to the propriety of an injunction. As such, the district court did not abuse its discretion in denying Dresser-Rand's motion for injunctive relief against Apix and Mezzatesta.

**CONCLUSION**

31

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, and for the reasons set forth above, we AFFIRM the post-trial rulings of the district court, with the exception of the district court's denial of Dresser-Rand's motion for judgment as a matter of law on its breach of contract claim against Apix. Finding that the district court erred in denying such motion, we REVERSE that portion of the district court's order and accordingly REMAND this case for further proceedings not inconsistent with this opinion. AFFIRMED in part, REVERSED in part, and REMANDED.