FILED
17-0557
6/19/2020 6:04 PM
tex-43906794
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# IN THE SUPREME COURT OF TEXAS

No. 17-0557

CLINTON W. ("BUDDY") PIKE, SR., DANIEL L. WALKER, W. TOBIN WILSON, VHSC CEMENT, LLC, AND FEW READY MIX CONCRETE CO., PETITIONERS,

V.

TEXAS EMC MANAGEMENT, LLC, TEXAS EMC PRODUCTS, LP, AND EMC CEMENT, BV, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TENTH DISTRICT OF TEXAS

**Argued September 24, 2019**

JUSTICE BUSBY delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BLACKLOCK joined, and in Part IV of which JUSTICE BLAND joined.

JUSTICE BLAND filed an opinion dissenting in part.

In this case, we address multiple issues arising out of the breakup of a limited partnership created to produce and market a new cement product. The partnership, its general partner, and the limited partner that supplied the cement-making technology sued the limited partners responsible for funding, the partnership's general manager, and the companies that foreclosed on and purchased the partnership's assets; those defendants asserted counterclaims. After a jury trial, the trial court rendered judgment in favor of the partnership on its claims of conspiracy, breach of contract, and tortious interference with a contract. The court also rendered judgment in favor of

the technology-supplying partner for breach of the partnership agreement, misappropriation of trade secrets, and conspiracy, and in favor of the funding partners for the partnership's breach of the partnership agreement. All parties appealed, raising a multitude of issues. The court of appeals largely affirmed the judgment, and parties on both sides of the dispute filed petitions for review, raising many of their issues again in this Court.

After addressing a challenge to the limited partner's standing, we hold that the plaintiffs failed to present legally sufficient evidence of damages and reverse the portion of the judgment awarding damages. We also conclude that the technology-supplying partner was not entitled to a permanent injunction for misappropriation of trade secrets and reverse that portion of the judgment. Finally, we conclude the company that purchased the partnership's assets and promissory note did not prove it was entitled to judgment as a matter of law on its counterclaim for the partnership's failure to pay a deficiency balance on the note, and we affirm that portion of the judgment.

## BACKGROUND

### A.     The parties create the Partnership to make and sell a new type of cement.

Concrete is made by mixing cement, water, sand, and gravel. Portland cement is a base ingredient of concrete and its most expensive component. Vladimir Ronin, a scientist living in Sweden, conducted research and experiments on how to make concrete more efficiently with less Portland cement. He mixed materials such as slag and microsilica (waste byproducts from steam and alloy production, respectively) with Portland cement in vibrating horizontal cylinders with balls of different sizes, subjecting the materials to intensive grinding. After processing in these vibrating ball mills, the strength of the cement base combined with these materials was much

higher than normal cement. Ronin named this new material "energetically modified cement" (EMC) and received a patent for the processing of Portland cement with different types of materials in the vibrating cylinders. He built a small pilot plant in Sweden to conduct additional experimentation and testing and went into business with Atle Lygren. They formed EMC Cement BV, a Dutch holding company, to own the exclusive rights to the energetically modified cement technology. Ronin continued his role with research and development, and Lygren took over business development.

While promoting the energetically modified cement, Ronin met Dan Walker, a chemical engineer and the owner of Few Ready Mix, a concrete business in Jasper, Texas. After discussions about replacing Portland cement with Texas fly ash (a waste byproduct from coal power plants), Walker shipped Texas fly ash to Sweden for testing. The testing showed positive results, so Ronin filed for additional patents. After Walker signed a confidentiality agreement, he and Ronin began producing a cement named CemPozz—containing 95% fly ash and 5% Portland cement—at a pilot plant in Jasper. About one year later, Ronin and Walker built a commercial-sized cement plant in Jewett, Texas, near a power plant that produced fly ash.

William Tobin Wilson, an investor, heard about the technology of converting fly ash into a cement product and began discussions about investing in the company. In 2005, he and Walker formed a limited partnership with Ronin and Lygren to do business in Texas. They named the limited partnership Texas EMC Products (the Partnership), and its primary objective was to "maximize the degree and speed of market penetration for the products in the state of Texas in accordance with market demand and market potential respecting sound business principles." Texas EMC Management, LLC (EMC Management) was the general partner and owned a 1%

3

interest in the Partnership; the members of EMC Management were Walker, Lygren, and Ronin. EMC Cement BV was a Class A limited partner, owning 49.5% of the Partnership. Walker, Walker's family members, and Wilson owned the remaining 49.5% of the Partnership and were Class B limited partners.

The partnership agreement required the Class B limited partners to provide financing, providing that they "shall loan funds to and/or obtain financing for the Partnership to meet the Primary Objective until such time as the Partnership has the financial ability to obtain such financing on its own resources." EMC Cement BV had no obligation to make loans to or obtain financing for the Partnership. According to the agreement, the Partnership was to terminate in 2055.

Around the same time the parties signed the partnership agreement, EMC Cement BV gave the Partnership an exclusive license to use its patents to produce and commercialize products in Texas. The license agreement gave EMC Cement BV the right to terminate the agreement under certain circumstances, and the agreement was not assignable or transferable without EMC Cement BV's written consent.

Clinton W. "Buddy" Pike, Sr. was hired as the general manager of EMC Management and the plant. He signed a management agreement that included confidentiality provisions.

The Partnership took out a loan of over $4 million. Because the Partnership did not have the ability to obtain its own financing, the note was guaranteed by Wilson, Walker and his wife, and Few Ready Mix. The note was secured by assets of the Partnership, including the plant and equipment in Jewett, as well as stocks held by Wilson in an investment account. The Partnership

4

paid the interest on the note, while Walker and Wilson paid monthly $25,000 principal reduction payments. Walker and Wilson considered these payments loans to the Partnership.

Ronin and Lygren used the plant in Jewett to continue marketing the technology to other potential investors. Around 2008, Ronin and Lygren began negotiations with C-Change Investments, LLC regarding commercializing the technology in California. They eventually signed a letter of intent regarding a potential partnership in which C-Change would commit to invest up to $50 million. Negotiations continued the following year with John Preston, a principal of C-Change, and Alan Quasha, the CEO of investment firm Quadrant Management. In December 2010, however, the negotiations were called off.

### B. The Partnership experiences problems and its assets are sold in foreclosure.

The CemPozz technology did not work as hoped. Seven-day strength testing did not produce consistent or acceptable results. Walker agreed that CemPozz was a "difficult sale" with a very small customer base. In 2006, the Partnership sold 81,402 tons of product and had net income of negative $141,686.72. The next few years were not better. The Partnership never made a profit. Even though it had the capacity to produce 300,000 tons of product, the most it sold in one year was 91,639 tons. In 2010, the Partnership sold only 58,149 tons with net income of negative $377,222.11.

To address the issue of CemPozz not meeting seven-day strength testing, the Partnership modified the vibrating ball mill in 2010, increasing the retention time of fly ash in the mill. Ronin filed for another patent on this method, and the new product was named Pozzo Slag to distinguish it from the old product, CemPozz. The seven-day strengths of the new product initially exceeded minimum specifications, and the Partnership began selling Pozzo Slag in December 2010. Ronin

5

testified that he considered this to be a turning point, and the Partnership was "ready to fly." In contrast, Pike testified that he did not expect the modifications to pull the Partnership out of its financial hole and there were still problems with Pozzo Slag. Maintenance costs more than doubled due to the additional time the Pozzo Slag ash remained in the vibrating ball mill. Pike prepared a budget for 2011, projecting the Partnership would sell 86,293 tons of product and have negative income of $338,959.

In January 2011, Wilson met with Ronin and Lygren to discuss dissolving the Partnership. No agreement was reached. Walker and Wilson decided they were not willing to loan any more money to the Partnership by making payments on the note because they did not think continuing to put money into the Partnership was a sound business decision. The Partnership defaulted on its loan in early 2011. The bank sent the Partnership a foreclosure notice, and Lygren responded with a letter threatening to sue the bank if it foreclosed. On April 20, after receiving the foreclosure notice, EMC Cement BV cancelled its license agreement with the Partnership.

After Lygren threatened to sue the bank, Walker and Wilson—through Few Ready Mix—paid the bank the remaining balance of the loan on May 2. The next day, Few Ready Mix held a foreclosure sale of the Partnership's property. VHSC Cement purchased the property at the foreclosure sale for $3.1 million, and it purchased Few Ready Mix's remaining interest in the bank loan shortly thereafter. VHSC had been formed less than a week before the foreclosure sale and was affiliated with Preston and Quasha, who had been involved in the prior negotiations with C-Change. Prior to the foreclosure sale, Walker and Wilson had discussions about the Partnership's business with Preston and Quasha that they did not disclose to Lygren or Ronin.

6

The day of the foreclosure, VHSC hired Pike to be its president and hired other employees of the Partnership. For six weeks after the May foreclosure, the plant continued manufacturing Pozzo Slag and using the vibrating ball mills without modification. Ronin testified that VHSC would need someone like Pike—who knew all the details of the technology—to produce the cement materials. After six weeks, VHSC had used all the Portland cement that was at the plant when it was purchased. VHSC then quit using Portland cement and instead mixed lime (calcium hydroxide) with fly ash in the products it was making. Over time, VHSC removed the vibrating ball mills and replaced them with reactors of its own design. The reactors are cylinders full of ceramic media that rotate with the lime and fly ash for one or two hours.

### C. The Partnership and other plaintiffs file this suit and obtain a substantial judgment that is largely affirmed on appeal.

The Partnership, its general partner EMC Management, and its limited partner EMC Cement BV (collectively, the EMC plaintiffs) filed suit against Pike, Walker, Wilson, VHSC Cement, and Few Ready Mix, asserting several causes of action. The EMC plaintiffs' claims against Walker and Wilson included breach of the partnership agreement and breach of fiduciary duty to EMC Management and EMC Cement BV. The EMC plaintiffs brought a claim against Pike for breach of his management agreement with EMC Management and claims against Few Ready Mix and VHSC for tortious interference with the partnership agreement and management agreement. The EMC plaintiffs asserted claims against all defendants for misappropriation of trade secrets and conspiracy. They also sought injunctive relief to prevent the defendants from disseminating or using the EMC plaintiffs' proprietary and confidential information.

7

VHSC filed counterclaims against the Partnership and EMC Management for breach of contract and tortious interference with prospective business relationships.[1] Walker and Wilson filed counterclaims against the Partnership for breach of the partnership agreement.

After trial, a jury found: (1) VHSC and Pike misappropriated EMC Cement BV's trade secrets; (2) Walker and Wilson failed to comply with their fiduciary duties to EMC Cement BV; (3) Walker and Wilson failed to comply with the partnership agreement; (4) VHSC, Pike, and Few Ready Mix knowingly participated in that failure; (5) VHSC intentionally interfered with Pike's management agreement; (6) Pike breached the management agreement; and (7) Walker, Wilson, Pike, VHSC, and Few Ready Mix were part of a conspiracy that damaged the Partnership and EMC Cement BV. The jury also found that the Partnership failed to comply with the partnership agreement as to Walker and Wilson. The jury answered "no" when asked whether the Partnership failed to comply with its promissory note to the bank by failing to pay the deficiency balance.

The trial court rendered judgment on the jury's verdict, awarding EMC Cement BV $1.5 million for misappropriation of trade secrets and conspiracy, and $7 million from Walker and Wilson for breach of the partnership agreement. The court awarded the Partnership $7 million for conspiracy and intentional interference with Pike's management agreement, and $1 million from Pike for breach of the management agreement. The court also awarded attorneys' fees to EMC Cement BV. The court denied the EMC plaintiffs' request for injunctive relief. As for Walker and Wilson's claims against the Partnership, the trial court awarded them each $148,038, which it offset against the damages they owed the Partnership.

---

[1] VHSC also sued Lygren and Ronin as third-party defendants for tortious interference with prospective business relationships. After trial, the court rendered a take-nothing judgment in those defendants' favor, and they are not parties to this appeal.

Walker, Wilson, and Few Ready Mix appealed, challenging the damages awards, the validity of the claim for breach of the partnership agreement, and the joint-and-several liability theories. VHSC and Pike also appealed, challenging the damages awards and contending that the claims for misappropriation of trade secrets, tortious interference, breach of the management agreement, and conspiracy failed as a matter of law. VHSC also asserted that it conclusively established its counterclaim against the Partnership for failure to pay the deficiency balance on the promissory note. EMC Cement BV also appealed, contending that the trial court abused its discretion in refusing to grant its request for a permanent injunction.

The court of appeals affirmed in part and reversed in part. 579 S.W.3d 390, 399 (Tex. App.—Waco 2017). The court concluded that the trial court erred in denying EMC Cement BV's request for a permanent injunction. *Id.* at 424–29. The court also modified the trial court judgment to reflect that Pike was not liable for intentionally interfering with his own management agreement. *Id.* at 414. The court otherwise affirmed the trial court's judgment. *See id.* at 429.

Pike and VHSC filed a joint petition for review in this Court. Walker, Wilson, and Few Ready Mix also filed a joint petition for review. In each petition, defendants bring several challenges to their liability and to the damages and attorneys' fees awarded. We granted review.

## ANALYSIS

I. **A challenge to a partner's ability to recover damages for injury to the value of its partnership interest is not jurisdictional.**

EMC Cement BV's damages include an award of $7 million for breach of the partnership agreement by Walker and Wilson (collectively, Walker). Walker challenges this award on several grounds, including that EMC Cement BV lacks "standing" as a limited partner to recover damages individually for an injury suffered by the Partnership.

9

As a threshold matter, it is unclear whether Walker is challenging EMC Cement BV's standing in the true constitutional sense of that term, which if lacking would deprive the trial court of subject-matter jurisdiction. *See DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008). Like jurisdiction, standing "is a word of many, too many, meanings."[2] Texas courts, having drawn upon the standing doctrine of our federal counterparts,[3] sometimes apply the label "standing" to statutory or prudential considerations that "do[] not implicate subject-matter jurisdiction" but determine whether a plaintiff "falls within the class of [persons] . . . authorized to sue" or otherwise has "a valid . . . cause of action." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (explaining why this use of the standing label can be "misleading").[4] Yet we have been clear in this century that the question whether a plaintiff has established his right "to go forward with [his] suit" or "satisfied the requisites of a particular statute" pertains "in reality to the right of the plaintiff to relief rather than to the [subject-matter] jurisdiction of the court to afford it." *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76–77 (Tex. 2000).[5] Thus, a plaintiff does not lack standing in its proper, jurisdictional sense "'simply because

---

[2] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998); *see Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 751–53 (Tex. 2017) (discussing different meanings of jurisdiction in immunity context); *Sneed v. Webre*, 465 S.W.3d 169, 186 n.12 (Tex. 2015) (discussing different meanings of standing); *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 n.1 (Tex. 2007).

[3] *See, e.g.*, *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993).

[4] *See also Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912, 915–17 & n.5 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (addressing distinction between constitutional standing requirements and statutory or rule-based requirements).

[5] In a line of recent cases including *Lexmark*, the U.S. Supreme Court has similarly led federal courts to distinguish more carefully between jurisdiction and merits. *See also, e.g.*, *V.L. v. E.L.*, 136 S. Ct. 1017, 1021 (2016) (per curiam) (observing that statutory requirement "does not become jurisdictional just because it is mandatory" (cleaned up)); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (discussing dichotomy between subject-matter jurisdiction and ingredients of claim for relief). In so doing, the Court has rightly retreated from the concept of so-called "prudential" standing, as our dissenting colleague notes. *Post* at ___. This retreat helps to clarify that the issue before us is whether the rules defining what a partner must prove to obtain relief go to jurisdiction or to the merits. As explained below, federal courts agree that the rule in question here falls on the merits side of this line.

he cannot prevail on the merits of his claim; he lacks standing [when] his claim of injury is too slight for a court to afford redress.'" *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484–85 (Tex. 2018) (quoting *Inman*, 252 S.W.3d at 305).[6]

It appears that Walker is not arguing EMC Cement BV lacks standing in this jurisdictional sense, as he asks us to render a take-nothing judgment rather than dismiss the breach claim for want of jurisdiction.[7]  Nevertheless, we have an obligation to examine our jurisdiction any time it is in doubt, so we consider first whether EMC Cement BV has standing to pursue its claim against Walker.  *See Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 580 (Tex. 2013).

The jury found that Walker failed to comply with the partnership agreement.  The charge then instructed the jury to consider the following measure of damages: "The difference, if any, in the value of EMC Cement's interest in the [Partnership] before and after the failure to comply" with the agreement.  Walker had objected to this measure at the charge conference, arguing that the claim for damages belonged to the Partnership and there was no evidence of a separate loss to EMC Cement BV over and above any loss the Partnership sustained.  The trial court overruled his objection, and the jury awarded EMC Cement BV $7 million under this measure.

In the court of appeals, Walker asserted that EMC Cement BV lacked standing to bring its claim for breach of the partnership agreement because a cause of action alleging harm to the

---

[6] As the quoted passages demonstrate, these cases go beyond holding that "gateway criteria to sue" are not jurisdictional, *see post* at ___; they also hold that statutory requirements and elements of a claim necessary to prevail on the merits are not jurisdictional.  In any event, as discussed below, we have held that compliance with the requirements for pursuing a derivative suit is not a matter of jurisdictional standing.  *See Sneed*, 465 S.W.3d at 186–87 (applying *Dubai Petroleum* to statutory elements of shareholder derivative suit).

[7] Our dissenting colleague suggests that we should "dismiss [EMC Cement BV's] recovery for want of jurisdiction." *Post* at ___.  But a court's jurisdiction is determined claim by claim, not damage element by damage element.  As we explain below, whether a plaintiff can recover a particular element of damages for its injury is a merits issue.

11

Partnership belongs to the Partnership, not to its individual partners. The court of appeals concluded this challenge implicated capacity—not standing—and had been waived because Walker's answer did not include a verified plea challenging EMC Cement BV's authority to recover in its capacity as a limited partner. 579 S.W.3d at 400–01 (citing TEX. R. CIV. P. 93).

In this Court, Walker argues the court of appeals erred in holding that a challenge to a partner's ability to sue individually for injury to the partnership is an issue of capacity requiring special preservation, and he cites various cases referring to such a challenge as raising an issue of "standing."[8] We conclude, however, that the authority of a partner to recover for an alleged injury to the value of its interest in the partnership is not a matter of constitutional standing that implicates subject-matter jurisdiction.

Both capacity and standing are necessary to bring a lawsuit. *See Coastal Liquids Transp., L.P. v. Harris Cty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* (quoting *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)). A plaintiff lacks capacity when, as pertinent here, he "is not entitled to recover in the capacity in which he sues." TEX. R. CIV. P. 93(2).

Concepts of standing and capacity have specialized application to business organizations and their stakeholders, requiring particular attention to the distinction between the two concepts. "Ordinarily," for example, "the cause of action for injury to the property of a corporation, or the

---

[8] *See, e.g.*, *Guerrero–McDonald v. Nassour*, 516 S.W.3d 198, 203–06 (Tex. App.—Eastland 2017, no pet.); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 361 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Hall v. Douglas*, 380 S.W.3d 860, 873–74 (Tex. App.—Dallas 2012, no pet.).

impairment or destruction of its business, is vested in the corporation." *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (quoting *Massachusetts v. Davis*, 168 S.W.2d 216, 221 (Tex. 1942)). "A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong" in the form of reduced stock value, because all stockholders will be made whole if the corporation obtains compensation. *Id.* Rather, "to recover individually, a stockholder must prove a personal cause of action and personal injury." *Id.*[9] The *Wingate* prohibition on recovering the lost value of an interest in an organization also applies to limited partners. *See In re Fisher*, 433 S.W.3d 523, 527 (Tex. 2014) (orig. proceeding).

Our statutes—together with the organization's governing agreement—now define more specifically which claims and remedies may be pursued by the organization and which by its stakeholders individually, and they also allow stakeholders to pursue the organization's claims in a derivative capacity in certain circumstances. *E.g.*, TEX. BUS. ORGS. CODE §§ 152.002, 152.210–.211, 153.401–.413; *see Sneed*, 465 S.W.3d at 188. In addition, an organization may transfer its claim to a stakeholder, or vice versa.

Walker cites *Wingate* and its progeny to support his argument that EMC Cement BV lacks standing to recover the lost value of its interest in the Partnership. But is the *Wingate* prohibition—as now articulated in our statutes—a matter of constitutional standing that affects a court's subject-matter jurisdiction?[10] Because Texas's test for constitutional standing parallels the federal test for

---

[9] *See also Linegar v. DLA Piper LLP*, 495 S.W.3d 276, 279–80 (Tex. 2016).

[10] As the court of appeals in *Lake v. Cravens* pointed out, "not once do the terms 'standing,' 'justiciability,' or 'subject matter jurisdiction' appear" in the *Wingate* majority opinion, which "repeatedly phrased the issue as a matter of 'recovering damages.'" 488 S.W.3d 867, 888 (Tex. App.—Fort Worth 2016, no pet.). The *Lake* court concluded, as we do below, that it would be improper to "conflate the standing requirement that [the plaintiff] suffer a personal injury with his ability or inability to recover damages that were arguably incurred by a different entity." *Id.*

Article III standing, we look to federal standing jurisprudence for guidance in answering this question. *See Meyers*, 548 S.W.3d at 485. Federal courts, including the U.S. Supreme Court and Fifth Circuit, have held that the answer is no.

In *Franchise Tax Board of California v. Alcan Aluminium Ltd.*, the U.S. Supreme Court held that shareholders have constitutional standing to sue for injuries to the corporation that lower the value of their shares, explaining that the "so-called shareholder standing" prohibition on suing to enforce corporate rights was actually a "longstanding equitable restriction." 493 U.S. 331, 336 (1990). The plaintiffs in the case challenged California's method of taxing two corporations in which they owned shares. *Id.* at 334. The taxing authority responded that shareholders seeking to redress corporate injuries lack Article III standing unless they also suffered personal injuries, which these plaintiffs did not. *See id.* at 335–36. The Supreme Court disagreed, reasoning that if the corporations' taxes were unconstitutionally high, the taxation method

> threatens to cause actual financial injury to [the shareholders] by illegally reducing the return on their investments in [the corporations] and by lowering the value of their stockholdings. A judicial determination that the . . . method is unconstitutional . . . would prevent such injuries. That is all that is required for Article III standing.

*Id.* at 336.[11]

The Fifth Circuit reached the same conclusion in *Ensley v. Cody Resources, Inc.*, 171 F.3d 315 (5th Cir. 1999), a case applying Texas law. There, the plaintiff sued in quantum meruit to

---

[11] Our dissenting colleague disagrees, contending that a stakeholder "lacks standing to personally recover for injuries to the [organization]." *Post* at ___. We conclude this contention is misplaced because the injury for which EMC Cement BV recovered damages is, in the language of the jury charge, a loss in the value of *its own interest* in the Partnership. The *Wingate* prohibition and our current statutes generally reserve any *recovery* for such an injury to the organization, though we need not resolve how those statutes apply to the facts of this particular case as explained below. But *Wingate*'s merits rule does not negate the jury's finding that EMC Cement BV itself also suffered injury, which confirms the allegations of injury that establish its standing.

14

recover for services rendered to the defendant through a corporation in which the plaintiff held stock. *Id.* at 317. The defendant moved for judgment as a matter of law during trial based on the *Wingate* prohibition, arguing that the plaintiff lacked standing to recover individually. *See id.* at 319. The district court disagreed, holding that the defendant's objection went not to standing in the jurisdictional sense but to a real-party-in-interest problem that was waived under federal procedural rules by failing to raise it before trial. *Id.* at 318. The Fifth Circuit affirmed, explaining that the defendant's "incantation that a shareholder may not sue for the corporation's injury does not attack [the shareholder's] injury in fact, and the cited cases—state and federal—do not suggest that the limitation on shareholder suits is based on a lack of injury." *Id.* at 319–20. Although the defendant's cases "refer to lack of standing as a shareholder, not one holds that the inquiry is jurisdictional or that the objection may not be waived." *Id.* at 320. The court concluded that the plaintiff had "suffered a concrete injury sufficient to meet the constitutional justiciability requirement" because he faced "a significant diminution in the value of [his] shares . . . without the quantum meruit damages," and the jury's "award of over $400,000 would redress that injury." *Id.* at 319–20.[12] Other federal circuits agree that a plaintiff has standing to sue for the lost value of its investment in a corporation.[13]

---

[12] *See also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("Whether recovery for such a claim is permitted under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.").

[13] *E.g.*, *White v. JPMorgan Chase Bank, NA*, 521 F. App'x 425, 428 (6th Cir. 2013) (explaining question before court was "not one of Article III standing" but "whether Michigan's substantive law precludes Plaintiff from bringing this diversity action"); *Grubbs v. Bailes*, 445 F.3d 1275, 1280 (10th Cir. 2006); *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 159 (7th Cir. 1996) ("'Standing' is a misnomer, because Frank has alleged injury in fact. His investment in [the corporation] has declined in value. Frank's problem is not standing (in the sense that the complaint does not allege a 'case or controversy' justiciable under Article III) but the identity of the real party in interest."); *Whelan v. Abell*, 953 F.2d 663, 671–72 (D.C. Cir. 1992) (explaining that "the problem is not an Article III one" but "really depends . . . on considerations and conventions of corporate law"). *See generally* William V. Dorsaneo, III,

This conclusion is consistent with our holdings in *Dubai Petroleum* and *Meyers* that whether a party can prove the merits of its claim or satisfy the requirements of a particular statute does not affect the court's subject-matter jurisdiction. *See Meyers*, 548 S.W.3d at 484–85; *Dubai Petroleum Co.*, 12 S.W.3d at 76–77.[14] We applied these holdings to the shareholder context in *Sneed*, declining to characterize an essential element of the shareholder's derivative claim as a matter of standing because doing so would render judgments vulnerable to collateral attack as void for lack of subject-matter jurisdiction. 465 S.W.3d at 186–87; *see id.* at 186 ("The defendants confuse standing with an issue that goes to the merits.").[15] Instead, we adhered to our "approach to jurisdictional questions designed to strengthen finality and reduce the possibility of delayed attacks on judgments." *City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009); *accord In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 311 (Tex. 2010) (orig. proceeding).[16] We do so again in this case.

---

*The Enigma of Standing Doctrine in Texas Courts*, 28 Rev. Litig. 35, 67 (2008) (explaining that "federal practice also requires the defendant to raise an objection to the plaintiff's right to make a claim").

[14] *See also Parker v. District of Columbia*, 478 F.3d 370, 378 (D.C. Cir. 2007) ("[W]e assume the merits when evaluating standing.").

[15] Refusing to recognize as jurisdictional a failure to comply with requirements for bringing a derivative suit, which can properly be raised in the trial court, does not treat those requirements as "a bygone vestige of corporate law." *Post* at ___.

[16] Similarly, the Supreme Court of Delaware treats issues of "standing" like the one before us as challenges to the sufficiency of the plaintiff's claim, not as challenges to a court's subject-matter jurisdiction. *See Appriva S'holder Litig. Co. v. EV3, Inc.*, 937 A.2d 1275, 1283 (Del. 2007). As that court has explained, when "the issue of standing is so closely related to the merits, a motion to dismiss based on lack of standing is properly considered under" the rule regarding failure to state a claim and not the rule regarding lack of jurisdiction. *Id.* at 1286. "[W]here a party is not arguing that the court lacks the authority to grant the relief requested to any plaintiff (i.e., lacks subject matter jurisdiction), but rather is arguing that the court cannot grant relief to these particular plaintiffs, the motion is more properly decided under [the rule regarding failure to state a claim] because the plaintiff has failed to plead a necessary element of a cognizable claim, not because the court does not have jurisdiction." *Id.* at 1285. Accordingly, although Delaware courts use the term standing to refer to statutory requirements a shareholder must meet to bring a challenge, the shareholder's compliance with those requirements is not jurisdictional and can be waived. *See In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 289 (Del. 2002) (per curiam) (refusing to address shareholder's standing to object to class-action settlement because issue had not been raised in trial court); *Voigt v. Metcalf*, C.A. No. 2018-

For these reasons, we hold that a partner or other stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization. In so holding, we are mindful of the statutory provisions that define and limit a stakeholder's ability to recover certain measures of damages, which protect the organization's status as a separate and independent entity.[17]  Those provisions, however, go to the merits of the claim; they do not strip a court of subject-matter jurisdiction to render a take-nothing judgment if the stakeholder fails to meet the statutory requirements.[18]

Having concluded that Walker's challenge to EMC Cement BV's "standing" does not concern subject-matter jurisdiction, we next consider whether it raises an issue of capacity requiring special preservation.  In the court of appeals' view, Walker is challenging EMC Cement BV's authority to recover its loss in its capacity as a limited partner, and he waived this issue by failing to file a verified plea under Rule 93(2).  We agree with the court of appeals that, by challenging EMC Cement BV's ability to recover the lost value of its interest in the Partnership, Walker was challenging EMC Cement BV's capacity.  We need not decide whether EMC Cement

---

0828-JTL, 2020 WL 614999, at *8 n.3 (Del. Ch. Feb. 10, 2020) (holding that even assuming claims were derivative, shareholders could assert them because defendants did not meaningfully argue shareholders failed to comply with requirements).

We disagree with the dissent that the Supreme Court of Delaware holds otherwise in *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016).  *See post* at __.  *Brinckerhoff* considered whether a partner's claims against a partnership were individual or derivative.  *Id.* at 1260.  After concluding that the claims were exclusively derivative, the court went on to hold that the partner lost standing to assert any derivative claims following a merger.  *Id.* at 1265.  Although the court's opinion includes some general statements about standing as related to jurisdiction, it does not address the trial court's jurisdiction over the claims.

[17] *Cf. post* at ___.

[18] In reaching this conclusion, we do not suggest that a limited partner could recover directly for the partnership's injury if that recovery were the subject of a proper objection in the trial court.  *Cf. post* at ___.

17

BV lacked capacity to recover, however, because we conclude there is insufficient evidentiary support for EMC Cement BV's damages even if it had capacity.

In *Pledger v. Schoellkopf*, we held that the question whether a claim brought by a shareholder actually belongs to the corporation is a matter of capacity. 762 S.W.2d 145, 146 (Tex. 1988) (per curiam). "When capacity is contested, Rule 93(2) requires that a verified plea be filed anytime the record does not affirmatively demonstrate the plaintiff's . . . right to bring suit . . . in *whatever* capacity he is suing." *Id.* Because the defendants did not file a plea contending that the plaintiff's claims were owned by the corporation, we concluded the plaintiff was entitled to recover on those claims and it was unnecessary to determine who owned them. *Id.* at 145–46.[19] Requiring a defendant to raise this "wrong plaintiff" problem by verified plea allows the plaintiff an opportunity to correct the problem if possible, such as through assignment or joinder, and signals whether the parties need to develop and present evidence on the issue at trial. *See CHCA E. Hous., L.P. v. Henderson*, 99 S.W.3d 630, 633–34 (Tex. App.—Houston [14th Dist.] 2003, no pet.); Dorsaneo, 28 REV. LITIG. at 66. Absent such a plea, "[j]ust how [the plaintiff] acquired the cause of action is not before [the] Court." *Van Voorhies v. Hudson*, 683 S.W.2d 809, 811 (Tex. App.— Houston [14th Dist.] 1984, writ ref'd n.r.e.).

We hold that the question whether a claim brought by a partner actually belongs to the partnership is likewise a matter of capacity because it is a challenge to the partner's legal authority

---

[19] Similarly, we have held that a defendant is liable on a contract in his individual capacity if he fails to file a verified plea contending that he executed the contract in a corporate capacity. *See W.O.S. Constr. Co. v. Hanyard*, 684 S.W.2d 675, 676 (Tex. 1985) (per curiam). And as one court of appeals has explained, "Texas law is clear, and this court has previously held numerous times, that a challenge to a party's privity of contract is a challenge to capacity, not standing. Whether a party is entitled to sue on a contract is not truly a standing issue because it does not affect the jurisdiction of the court; it is, instead, a decision on the merits." *Highland Credit Opportunities CDO, L.P. v. UBS AG*, 451 S.W.3d 508, 516 (Tex. App.—Dallas 2014, no pet.) (cleaned up).

18

to bring the suit.  *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005) (explaining that capacity "is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate" (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1559, at 441 (2d ed. 1990))); *Pledger*, 762 S.W.2d at 146.[20]  Chapters 152 and 153 of the Business Organizations Code include sections addressing a partner's authority to sue.[21]

Section 152.210 provides that one partner is liable to another (and to the partnership) for "a violation of a duty to the partnership or other partners under this chapter that causes harm to the partnership or the other partners."  BUS. ORGS. CODE § 152.210(2).  Section 152.211 then delineates the authority of partners and partnerships to bring claims and seek various remedies.  It provides that one partner "may maintain an action against . . . another partner for legal or equitable relief" to enforce certain rights or otherwise protect its interests, and that the partnership "may maintain an action against a partner for a breach of the partnership agreement . . . causing harm to the partnership."  *Id.* § 152.211(a)–(b).  In addition, Chapter 153 expressly gives a limited partner authority to sue derivatively for injury to the limited partnership when certain requirements are met.  *See id.* §§ 153.401–.413.

---

[20] *See also* Dorsaneo, 28 REV. LITIG. at 65 ("[I]f the claim actually belongs to one person, such as a corporation, but the action is filed by another person, such as a corporate shareholder or a related company, the issue should be whether the claimant is authorized to prosecute the claim on behalf of the actual owner.  This is a waivable capacity problem, not a jurisdictional standing problem.").

[21] For the reasons explained above, we disagree with our dissenting colleague that these statutes determine a limited partner's constitutional standing to sue for injury to the value of its partnership interest.  *Cf. post* at ___.

Here, EMC Cement BV has not sued in a derivative capacity for injury to the Partnership.[22] Instead, the parties dispute whether the damages EMC Cement BV recovered were personal or for harm to the Partnership, as well as whether sections 152.210 and 152.211 authorize EMC Cement BV to recover those damages. Because Walker's answer did not include a verified plea challenging EMC Cement BV's capacity to recover as required by Texas Rule of Civil Procedure 93(2), the court of appeals concluded he waived these challenges to EMC Cement BV's damages. 579 S.W.3d at 401 (citing *Austin Nursing Ctr.*, 171 S.W.3d at 849).

In reaching this conclusion, the court of appeals did not consider our *In re Fisher* decision. There, one limited partner sued two others, who sought dismissal on the ground that the plaintiff's claims against them actually belonged to the partnership. 433 S.W.3d at 527. We explained that a partner "may bring claims for those injuries he suffered directly." *Id*. Because the plaintiff alleged that he suffered damages and nothing in his petition "affirmatively negate[d] his having been personally aggrieved," we concluded the trial court did not clearly abuse its discretion in rejecting the defendants' request for dismissal. *Id.* at 527–28 (cleaned up).[23]

Although we agree with the court of appeals that challenges to capacity must be raised by a verified plea in the defendant's answer, *see* Tex. R. Civ. P. 93(2), *Fisher* shows that issues regarding a partner's authority to sue for damages to the partnership will not always be apparent

---

[22] The dissent suggests we are ignoring the requirements for asserting a claim derivatively. *Post* at ___. But as the dissent admits, "these provisions do not govern this suit." *Id*. at ___.

[23] Although *In re Fisher* characterized a partner's inability to recover for injuries to the partnership that merely diminish the value of its interest as a lack of "standing," 433 S.W.3d at 527–28, there was no dispute that the issue had been preserved in the trial court, and the question of whether this restriction was more properly characterized as a merits issue—and, more particularly, as a lack of capacity—was not before us. *Cf. Austin Nursing Ctr.*, 171 S.W.3d at 848 & n.1 (noting "courts and parties have sometimes blurred the distinction between standing and capacity").

from the face of the plaintiff's petition. In this case, both the Texas EMC Products partnership and its limited partner EMC Cement BV sued other partners. EMC Cement BV did not plead that it was attempting to recover damages suffered by Texas EMC Products. Their petition referred to both Texas EMC Products and EMC Cement BV as "Plaintiffs," and they alleged that "Plaintiffs have sustained damages as a direct and proximate result of Walker and Wilson's breaches."

Because EMC Cement BV alleged that it sustained damages as a result of Walker and Wilson's breaches, Walker had no reason under *Fisher* to file a verified plea challenging EMC Cement BV's capacity to recover for damages to Texas EMC Products. Walker's complaint about what damages EMC Cement BV was attempting to recover did not arise until EMC Cement BV requested that the jury be instructed to base its damages for Walker and Wilson's breach of the partnership agreement on the difference in the value of EMC Cement BV's interest in the partnership before and after the breach. Walker objected to the instruction, asserting that the claim for damages belonged to the Partnership and there was no evidence of a separate loss to EMC Cement BV over and above any loss sustained by the Partnership. Because Walker timely raised this complaint in the trial court, we may consider it as part of his challenge to EMC Cement BV's damages. As we discuss in Part III, however, we conclude there is insufficient evidence of those damages for other reasons. Having held that Walker's challenge does not implicate subject-matter jurisdiction, we overrule this issue.

## II. The court of appeals erred in reinstating the damages award for misappropriation of trade secrets.

These petitions also raise a plethora of issues that do not purport to implicate jurisdiction. We turn next to the issues challenging the damages awards. Due to our disposition of these issues, we do not reach many of the other issues raised.

21

We begin with damages for misappropriation of trade secrets. VHSC and Pike assert that the court of appeals improperly rendered judgment on the jury's award of misappropriation damages because the trial court disregarded those damages in part and EMC Cement BV's brief in the court of appeals did not challenge that ruling.

The jury found that VHSC and Pike misappropriated EMC Cement BV's trade secrets. In question 2, the jury was instructed to consider two measures of damages: (a) "the value, if any, that a reasonably prudent investor would have paid for use of the Trade Secrets in Texas," and (b) "the costs saved by VHSC as a result of its use, if any, of the Trade Secrets in Texas." The jury awarded $1.5 million for each measure. Defendants filed a motion to disregard the jury findings and for judgment notwithstanding the verdict (JNOV), arguing there was no evidence to support either measure of damages submitted in question 2. The trial court granted the motion in part and (as relevant here) set aside the jury's $1.5 million award in response to question 2(a): "the value, if any, that a reasonably prudent investor would have paid for use of the Trade Secrets in Texas." In its final judgment, the trial court awarded $1.5 million for misappropriation of trade secrets.

In the court of appeals, VHSC and Pike argued there was no evidence of costs saved by VHSC to support the $1.5 million awarded under question 2(b). 579 S.W.3d at 413. EMC Cement BV responded that Lygren's testimony that he invested $20 million in EMC technology supported the jury's answer to question 2(b). *See id.* at 417. It also pointed out, but did not challenge, the trial court's order disregarding the $1.5 million answer to question 2(a). *See generally id.*

The court of appeals agreed there was no evidence to support the damages awarded under question 2(b), noting that EMC Cement BV failed to direct that court to record evidence of any saved development costs. *Id.* at 418. Although Lygren testified about his personal investment in

22

the entire EMC business, that investment could have financed other business expenses, leaving the jury to speculate on the amount VHSC saved. *Id.* The court of appeals went on to affirm the $1.5 million judgment for misappropriation of trade secrets, however, on the ground that the trial court had erred in setting aside the jury's award under question 2(a). *Id.* at 418 n.10. The court of appeals reversed the portion of the JNOV setting aside that jury finding and affirmed the $1.5 million misappropriation award. *Id.*

In this Court, VHSC and Pike assert that the court of appeals erred by reinstating the award of misappropriation damages stricken by the trial court and not challenged on appeal by EMC Cement BV. They contend that the court of appeals not only erred in addressing this unassigned and unbriefed error but also failed to address the grounds supporting the trial court's JNOV order before reversing. We agree that the court of appeals erred in reversing the unchallenged JNOV disregarding the $1.5 million answer to question 2(a).

A court of appeals may not reverse a trial court judgment on a ground not raised. *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008) (citing TEX. R. APP. P. 53.2(f)).[24] Our adversary system of justice generally depends "on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). "The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." *United*

---

[24] *See also Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (per curiam) ("We have held repeatedly that the courts of appeals may not reverse the judgment of a trial court for a reason not raised in a[n issue presented]."); *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990) (per curiam) ("A court of appeals may not reverse a trial court's judgment in the absence of properly assigned error.").

*States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring).[25] This principle extends to unchallenged rulings regarding damages. *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 726 (Tex. 2016) (concluding court of appeals improperly reversed trial court's judgment after party abandoned issue regarding proper measure of damages on appeal).

Because EMC Cement BV did not assign error or brief a challenge to the trial court's JNOV disregarding the jury's award of damages in response to question 2(a), the court of appeals erred in reversing that portion of the trial court's judgment and holding that the question 2(a) award could support the judgment awarding EMC Cement BV $1.5 million in damages for misappropriation of trade secrets. The court of appeals held that no evidence supported the misappropriation damages awarded under question 2(b), and EMC Cement BV has not sought our review of that holding. *See* 579 S.W.3d at 418. As a result, the court of appeals should have rendered judgment that EMC Cement BV take nothing in damages for misappropriation of trade secrets, and we render judgment accordingly. *See* TEX. R. APP. P. 60.2(c).

### III. The other damage awards were not supported by legally sufficient evidence.

All of the remaining damage awards were based on the loss in value of the Partnership or the loss in value of EMC Cement BV's interest in the Partnership. "Value" was defined in the jury charge as "'Market Value,' the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling." Consistent with the jury's findings, the trial court's judgment awarded the Partnership

---

[25] *See also McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991) ("What makes a system [of justice] adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties.").

$7 million for lost value caused by tortious interference with Pike's management agreement and $1 million for lost value caused by breach of that management agreement. The judgment also awarded EMC Cement BV $7 million for lost value of its interest caused by breach of the partnership agreement.

Lygren testified at trial about the future earnings of the Partnership, and Paula Miller, a financial consultant, testified by deposition. Lygren testified that the value of the Partnership before the foreclosure sale was $12 million, and Miller's valuation was $5.3 million. Harry Swanstrom, whose engineering firm designed and built the Partnership's plant, testified that the value of the plant and equipment was $4.1 million. Lygren also testified that the value of the plant was $4 million. The EMC plaintiffs contend this evidence supports a market value of $16 million for the Partnership, and therefore the court of appeals properly upheld the damages awards.[26]

Defendants challenge all of this expert testimony as legally insufficient to support the damages awarded. When reviewing a no-evidence challenge, we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain a challenge to the legal sufficiency of the evidence if (1) there is a complete lack of evidence of a vital fact, (2) "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact," (3) there is no more than a scintilla of evidence offered to prove a vital fact, or (4) "the evidence conclusively

---

[26] The parties dispute whether the trial court violated the one-satisfaction rule by including all of these awards in the judgment. Because we conclude the awards are unsupported by legally sufficient evidence, we do not reach this issue.

establishes the opposite of the vital fact." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004). We address each expert's testimony in turn.

## A.  Value of the plant and equipment

Swanstrom testified regarding the value of the plant and equipment at the time of foreclosure in 2011, and he concluded its value was $4.1 million. Swanstrom and his company, Swanstrom Engineering, built the Partnership's plant beginning in 2003. He testified that the land on which the plant sits was purchased for $10,000, and the total cost of equipment and labor for plant construction and modifications (completed in 2005) was $3,298,478. To calculate the value of the plant in 2011, Swanstrom added a 20% escalation factor to the original plant construction costs, which he testified was a conservative addition to accommodate increased costs of material and labor. He acknowledged that his calculations included the value of the equipment as new even though the equipment was used by 2011, equipment wears out, and used equipment is worth less than new equipment. But he testified that he did not think there was a way to establish the fair market value of the equipment in the plant as it was standing in 2011. The equipment would have value as scrap if removed, but the facility would not have value as an operating facility if it were torn apart.

Defendants challenge Swanstrom's testimony as irrelevant because it addressed only the cost of new equipment, not the fair market value of the plant and existing equipment that had been in use for years. The EMC plaintiffs respond that the court of appeals correctly upheld Swanstrom's measure of damages. The court of appeals concluded that when property has no readily ascertainable fair market value, damages can be measured by the property's actual value at the time of loss. 579 S.W.3d at 419–20 (discussing *Burns v. Rochon*, 190 S.W.3d 263, 270–71

26

(Tex. App.—Houston [1st Dist.] 2006, no pet.), and other cases concerning damages for conversion). The parties also point to cases explaining that although purchase price alone is not sufficient to support an award of damages, it can be a proper starting point for calculating actual value. *See Wise v. SR Dall., LLC*, 436 S.W.3d 402, 412–13 (Tex. App.—Dallas 2014, no pet.). In the EMC plaintiffs' view, Swanstrom's calculation was proper because in addition to the original construction price, he considered wear and tear, repair and maintenance costs, and his experience with and knowledge of the market for similar equipment. We disagree with the EMC plaintiffs for three reasons.

First, the measure of damages submitted to the jury without objection was the fair market value of the Partnership, not its actual value. We must review the sufficiency of the evidence using that measure. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Evidence of the purchase price of the Partnership's property is insufficient under that measure because it does not establish the fair market value of the property at a different time.[27]

Second, even assuming without deciding that actual value would be a correct measure of damages in a case like this if included in the charge, purchase price is merely a starting point for calculating actual value. *Wise*, 436 S.W.3d at 412–13. Courts employing an actual-value measure have held that "[f]rom that starting point, adjustments are made for wear and tear, depreciation, and other pertinent factors." *Id.* at 413. Having examined the record, we disagree with the EMC

---

[27] *See McGinty v. Hennen*, 372 S.W.3d 625, 628–29 (Tex. 2012) (per curiam) (rendering take-nothing judgment after holding testimony regarding value of house at time of trial was no evidence of its market value six years earlier); *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 668 (Tex. 1996) (noting that owner of mobile home that caught fire conceded his testimony at trial about cost of home was "not admissible to show its market value at the time of the loss"); *Lee v. Dykes*, 312 S.W.3d 191, 198–99 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (recognizing evidence of purchase price alone cannot establish market value and rendering take-nothing judgment where purchase price was only evidence of damages presented).

plaintiffs that Swanstrom took anything other than purchase price—and a 20% escalation factor—into account in opining about the value of the plant and equipment.

As discussed above, Swanstrom testified that his value included the $10,000 purchase price of the land, as well as the $3,298,478 cost of the equipment and labor used to build and modify the plant through 2005. To the latter figure, he applied an escalation factor of 20% to accommodate the increased cost of building the plant at the time of foreclosure in 2011. Although Swanstrom acknowledged that used equipment would be worth less than equivalent new equipment, he did not testify about adjusting the purchase price to determine this lesser value. Contrary to the EMC plaintiffs' assertion, Swanstrom did not adjust for wear and tear, repair, or maintenance costs when valuing the plant and equipment. Because Swanstrom addressed only the purchase price of the plant and equipment through 2005, his testimony was no evidence of either actual or fair market value in 2011.

Third, Swanstrom did not attempt to tie the value of the plant to the market value of the Partnership, which was the only measure of damages in the jury charge. He did not address whether any debt encumbered the plant, for example, or otherwise testify regarding how loss of the plant and equipment impacted the value of the Partnership as a whole. We therefore agree with defendants that Swanstrom's testimony regarding the value of the plant and equipment was no evidence of lost market value of the Partnership.

The EMC plaintiffs also contend that Swanstrom's testimony of the value of the plant was unnecessary to support the judgment because Lygren, an owner of the plant and equipment, testified that its value was $4 million. Lygren was asked if he was familiar with the value of the plant "as carried on the books of [the Partnership] as of March 2011," to which he responded,

"Going by memory now, I believe it's about $4 million." Defendants respond that this testimony is likewise no evidence of fair market value.

A property owner may testify about the market value of his or her property if the testimony is "based on the owner's estimate of market value" and not some other value. *Redman Homes*, 920 S.W.2d at 669; *see Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012) (explaining that real property owner can establish value of his property through "[e]vidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors").[28] But Lygren did not address the market value of the plant and equipment. Rather, he testified that the value of the plant as carried on the Partnership's books in 2011 was "about $4 million." Book value and market value are not the same.[29] Because Lygren did not explain how this book value related to the market value of the Partnership, his testimony regarding the value of the plant was no evidence of the Partnership's fair market value. *See Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 923 (Tex. 1977) (explaining that when there was no showing that estimate of property's market value under income approach was equal to its book value, the two could not be equated).

Nor can the EMC plaintiffs rely on the foreclosure-sale price of the plant as some evidence of a loss in market value to the Partnership. As with their other evidence regarding the plant's

---

[28] When a business organization owns the property at issue, there are special rules about who may testify on its behalf regarding the property's value. *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852–55 (Tex. 2011). The parties have not addressed whether Lygren was qualified to testify on behalf of the Partnership, and we express no opinion on that question.

[29] *Chaffe v. Murray*, 492 S.W.2d 680, 685 (Tex. App.—Corpus Christi 1973, writ ref'd n r.e.) ("'Market value' of a business and 'book value' thereof are not synonymous."); *see Mandell v. Mandell*, 310 S.W.3d 531, 537 (Tex. App.—Fort Worth 2010, pet. denied) (describing the difference between book value and market value, and how valuations under each may be different).

value, evidence of the price paid in a foreclosure sale is no evidence of fair market value because there is not a willing seller who—in the words of the jury charge—"is under no necessity of selling." *See Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 663 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citations omitted). Defendants also presented uncontroverted evidence that the debt on the plant exceeded the foreclosure-sale price, and there was no evidence explaining how the foreclosure-sale price of an encumbered asset would translate into a loss of market value to the Partnership.

For these reasons, there is no evidence showing how the lost plant and equipment impacted the fair market value of the Partnership. Evidence regarding the value of the Partnership's plant and equipment thus provides no support for the jury's damage awards.

### B. Market value of the Partnership

Lygren and Paula Miller testified regarding the market value of the Partnership itself. Both relied on calculations of EBITDA, which stands for earnings before interest, taxes, depreciation, and amortization, and is one way of measuring a business entity's earnings and cash flow. Defendants did not object to the admission of this testimony at trial; instead, they contend on appeal that the testimony is speculative and conclusory, and thus legally insufficient evidence of damages. The EMC plaintiffs respond that defendants are attempting to challenge the reliability of the experts' opinions—including the methodology and foundational data they used—without objecting when the testimony was offered, and that the testimony is neither speculative nor conclusory in any event.

When a party wishes to complain that expert testimony is legally insufficient to support the judgment because the basis offered for it is unreliable, it should challenge the admission of the

30

testimony before trial or object when it is offered. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–17 (Tex. 2009). But a party need not object in order to challenge the expert testimony as conclusory or speculative on its face; it need only preserve a challenge to the legal sufficiency of the evidence, which it may do post-verdict. *See id.* As we have explained:

> When the expert's underlying methodology is challenged, the court "necessarily looks beyond what the expert said" to evaluate the reliability of the expert's opinion. When the testimony is challenged as conclusory or speculative and therefore non-probative on its face, however, there is no need to go beyond the face of the record to test its reliability. We therefore conclude that when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. However, when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility.

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (citations omitted).

Requiring an admissibility objection to the reliability of expert testimony gives the proponent a fair opportunity to cure any deficiencies and prevents trial and appeal by ambush. *Pollock*, 284 S.W.3d at 817. Thus, when an expert opinion "is admitted in evidence without objection, it may be considered probative evidence even if the basis of the opinion is unreliable." *Id.* at 818. But conclusory or speculative opinion testimony is not relevant evidence because it does not make the existence of a material fact more or less probable. *Coastal Transp. Co.*, 136 S.W.3d at 232 (citing TEX. R. EVID. 401). Evidence that lacks probative value will not support a jury finding even if admitted without objection. *Id.*; *see Pollock*, 284 S.W.3d at 816 ("Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence.").

The EMC plaintiffs contend that a party may challenge the legal sufficiency of expert testimony without objecting to its admission only if the challenge is based on a complete lack of supporting evidence. We disagree. Although expert testimony is conclusory (and an objection unnecessary) "if no basis for the opinion is offered," it is likewise conclusory if "the basis offered provides no support" for the opinion. *Pollock*, 284 S.W.3d at 818; *accord Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex. 1999) (holding affidavit conclusory and explaining that qualified expert "cannot simply say, 'Take my word for it, I know'" because credentials do not supply a basis for opinion). We address below whether defendants needed to make an admissibility objection to preserve each of their challenges to the experts' testimony.

### 1. Lygren's testimony

Lygren testified that the value of the Partnership's business operation was $12 million not including the value of the plant and equipment. He offered two bases for this value. First, he projected annual EBITDA for ten years beginning in 2011 based on varied price increases and an annual 19% sales volume increase.[30] He applied a 20% discount rate to these annual EBITDA projections to determine their present value. Second, Lygren testified that he also based his $12 million value on the letter documenting C-Change's intent to invest up to $49 million in a California company.

We begin by addressing Lygren's EBITDA valuation. Lygren started with a 2011 base projection and computed his subsequent yearly projections using that figure. Pike had prepared a budget for 2011 with sales and EBITDA projections, and Lygren relied on many of Pike's figures

---

[30] Defendants did not challenge Lygren's methodology of projecting EBITDA in future years to determine market value. We therefore express no opinion regarding whether this is an appropriate method of valuing the Partnership.

when calculating his own EBITDA projection for that year, including Pike's sales projection of 86,293 tons. Lygren projected the EBITDA for 2011 as $819,000.

Defendants' first challenge to Lygren's 2011 base projection concerns his failure to deduct certain operational costs when calculating EBITDA. The EMC plaintiffs respond that this complaint is waived because it concerns Lygren's underlying methodology and technique, and therefore it is a reliability challenge that had to be raised by objecting to his testimony at trial. We agree with the EMC plaintiffs.

As noted above, a challenge to an expert's underlying methodology necessarily requires a court to look beyond what the expert said to evaluate the reliability of his opinion. *Coastal Transp. Co.*, 136 S.W.3d at 233. A methodology challenge must be timely so there is an opportunity for the parties to develop the record and the trial court to conduct a reliability evaluation in its role as gatekeeper; it is not an analysis to be undertaken for the first time on appeal. *See id.*

Defendants' challenge to Lygren's failure to deduct certain costs is a challenge to the formula he used to determine EBITDA. Indeed, VHSC and Pike expressly assert that Lygren failed to follow "[t]he proper method for calculating EBITDA." This challenge would require us to look beyond Lygren's testimony and evaluate his underlying methodology and technique.[31] Because defendants neither objected at trial nor developed the record regarding the proper method for calculating EBITDA, we do not address that question. *See id.*

Defendants next complain that Lygren's 2011 EBITDA base calculation is conclusory because his assumed sales price per ton has no basis in fact and was not validated through any

---

[31] *See* Harvey Brown & Melissa Davis, *Eight Gates for Expert Witnesses: Fifteen Years Later*, 52 HOUS. L. REV. 1, 167, 172 (2014) (noting distinction between challenging reliability of damages expert's methodology and challenging foundational data to which methodology is applied).

market analysis or study. This argument challenges whether the factual basis Lygren offered supports his sales price assumption, so defendants were not required to raise it in an admissibility objection. *See Pollock*, 284 S.W.3d at 818. Lygren estimated that the Partnership could charge $52.97 per ton of product sold in 2011 while also increasing sales.[32] Lygren's price estimate was a 21% increase over the Partnership's $43.76 price per ton in 2010—the highest price it had ever received. Lygren testified that he did not calculate an annual percentage increase, but he applied the prices the Partnership charged between 2005 and 2010 and continued that trend into the future.

In contrast to Lygren's projection that the Partnership could obtain a 21% higher price for its product in 2011 than in 2010, the price increase from 2009 to 2010 was 1.25%, and the increase from 2008 to 2009 was 6%. From 2006 to 2010, the annual price increase was never more than 6%. Although the price increase from 2005 to 2006 was 23.68%, Lygren failed to explain how the much lower annual price increases over the succeeding four years created a trend supporting his opinion that the price per ton would increase 21% in 2011. Given the gap between the trend in annual price increases on which Lygren relied and his conclusion that the Partnership could increase its price to $52.97 in 2011, Lygren's data provide no support for his 2011 base calculation.[33] *See id.* at 819.

Defendants also complain that all of Lygren's EBITDA testimony was conclusory because his projections for years after 2011 were based on unfounded assumptions about the Partnership's sales increases. Defendants' legal sufficiency challenge was likewise sufficient to preserve this

---

[32] In contrast, Pike's price projection for 2011 was $43.70 per ton.

[33] We also note that at the time of trial, some actual sales data was available for the first quarter of 2011. Defendant's expert testified that the growth rate for the first quarter was less than both Pike's and Lygren's projections. And in February, the year-to-date EBITDA was negative $15,396.25.

complaint for appellate review. *See id.* at 818. The EMC plaintiffs respond that Lygren's testimony was not unreliable on its face, as it was based on a widely accepted valuation method and supported by substantial data. Specifically, they point out that Lygren's conclusions were based on the total amount of Portland cement sold in Texas, the market penetration of CemPozz, and the Partnership's average EBITDA during the period from 2005 to 2010. Lygren then projected the volume of product the Partnership would sell, the sales price, and other costs to calculate the Partnership's EBITDA for each year from 2011 to 2020.

Lygren based his EBITDA calculations on his conclusion that the Partnership's sales would grow at an annual rate of 19% from 2012 to 2020. He testified this rate of increase was reasonable because (1) it was based on Pike's projection of 2011 sales, and (2) CemPozz had a low market penetration rate, so there was significant upside potential.[34] Defendants assert this sales growth rate cannot be reconciled with the facts, and Lygren failed to bridge the analytical gap between the facts on which he relied and his conclusion. We agree with defendants that Lygren's testimony was legally insufficient based on an analytical gap between the data and his opinion. *See Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 835 (Tex. 2014).

Regarding Pike's sales projection for 2011, Lygren failed to explain how it supported an annual 19% increase in sales through 2020. In 2006, the Partnership sold 81,402 tons of product. 2007 was its peak sales year at 91,639 tons. Its sales then decreased each year until 2010 (its last full year in business), when it sold 58,148 tons.

---

[34] Although Ronin testified that he considered the company to be at a turning point in December 2010 when it began selling the new product, Pozzo Slag, Lygren only addressed CemPozz in his valuation testimony.

Pike projected an increase in sales to 86,293 tons in 2011. But no evidence was presented regarding what factors Pike considered in making his 2011 projection, or whether those considerations would translate to annual sales increases thereafter. Multiple witnesses testified that the recession impacted 2010 sales numbers. Miller testified that in determining a growth rate for 2011, "growth" was not additional business but gains to get the business back to where it once was prior to the 2010 recession. Lygren did not explain how Pike's 2011 projection of an increase in sales the year after a recession supported his conclusion that sales would continue to increase by 19% each year thereafter.

As for market penetration, Lygren did not explain how the Partnership would increase its penetration rate when it had been unable to do so in prior years. The market penetration rate of CemPozz was very low—around 1%. Pike testified regarding the Partnership's lack of success with marketing and sales of CemPozz. He explained that penetrating the market was difficult because ready-mix concrete producers already had sources of products and were very comfortable with their current mix designs. Some producers were not even willing to test new products given the risk of having to fix faulty concrete slabs. Pike further explained that concrete producers evaluate a new product by comparing it to their existing products in terms of cost and results of 28-day strength tests. Producers concluded the strength-test results of CemPozz were not high enough to be competitive with their existing mixes even though CemPozz was less expensive. Pike testified that the Partnership tried to get producers to retest CemPozz after initial negative test results, but some would not and others retested but got the same results. Lygren did not address the reasons underlying the low market penetration rate, and his assumption that the Partnership's sales would grow simply because they had room to grow is speculative on its face.

"It is incumbent on an expert to connect the data relied on and his or her opinion and to show how that data is valid support for the opinion reached." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex. 2009). Evidence of future income used to determine fair market value should not be "hypothetical or hopeful but substantial in the circumstances" and "based on objective facts, figures, or data." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 279–80 (Tex. 2015). Further, an expert's valuation must account for "basic marketplace realities"—here, the Partnership's difficulty with marketing and its decreasing sales almost every year. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 184 (Tex. 2001).

Lygren failed to connect his supporting data—Pike's 2011 sales projection and the low market penetration rate of CemPozz—to his conclusion that the Partnership's sales would increase 19% each year. For these reasons, his testimony on sales projections was speculative and conclusory on its face and provided no evidence of damages. *See Pollock*, 284 S.W.3d at 817–18.

We next address the alternative basis for Lygren's $12 million valuation of the Partnership's business: the non-binding letter of intent between EMC Cement BV and C-Change.[35] In the letter, C-Change stated its interest in forming a company with EMC Cement BV to commercialize the EMC product in California. The letter provided that C-Change would contribute a maximum "aggregate investment of $50 million to the California Company." In

---

[35] The EMC plaintiffs assert that defendants waived any challenge to Lygren's reliance on the potential California deal as a basis for his opinions because they failed to raise it in their opening briefs in the court of appeals. But defendants' opening briefs presented issues contending there was no legally sufficient evidence of damages, and they included lengthy arguments attacking plaintiffs' evidence of damages. Thus, defendants could argue in reply that specific portions of Lygren's testimony to which plaintiffs pointed in their appellees' brief were insufficient to support the damages. *Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162–63 (Tex. 2012) ("Appellate courts must treat the statement of an issue 'as covering every subsidiary question that is fairly included.'" (quoting TEX. R. APP. P. 38.1(f))).

exchange, C-Change would receive preferred stock and 8% dividends. There was not a business or plant in California at that time, and negotiations on the deal fell apart.

Lygren testified that his opinion of the value of the Partnership's business was $12 million "based just upon the California Letter of Intent and a comparison of the Texas and California markets," which showed the markets were similar in size and the EMC technology was applicable in California. Defendants contend this testimony is conclusory because Lygren did not explain how he reached his conclusion that an unconsummated California transaction supports a valuation of an existing Texas business. Nor did he attempt to account for differences in the markets, such as the lack of fly ash in California.

"[A]n expert's statement or opinion is conclusory when . . . he offers only his word that the bases offered to support his opinion actually exist or support his opinion." *Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex. 2019). We agree that Lygren offered nothing more than his word that the letter of intent supported his conclusion; his testimony was therefore no evidence of the fair market value of the Partnership. *See id*.

### 2. Miller's testimony

In deposition testimony read at trial, Miller forecasted the future earnings of the Partnership using the standards of the American Society of Appraisers and the American Institute of Certified Public Accountants. She was not asked to prepare a report and pointed out that she was testifying only about the present value of the forecasted earnings. She relied on the Partnership's historical balance sheets, profit and loss statements, and annual EBITDA figures from 2006 through March 2011. She testified that she projected future EBITDA figures over a seven-year business cycle with a present-value discount of 20%. Her projected growth rates from 2011 through 2018 varied

from 11% to 18%, which she set by considering the Texas and United States economies, the Texas housing construction industry, and the status of the Partnership as a "start-up." Based on these projections, she concluded the present value of the Partnership's future earnings was $5.3 million.

Defendants complain that Miller's assumed annual growth rates of 11% to 18% were without any objective basis to support such a significant turnaround for the Partnership. As they point out, Miller acknowledged that the Partnership's net income was negative for each of the years it was operating. She also acknowledged a decline in sales in 2006, an increase in 2007, and a decline from 2008 through 2010. Together, the Partnership's rate of sales growth from 2006 through 2010 was zero.

We agree that Miller's testimony is conclusory because she did not connect the data on which she relied—the United States and Texas economies and the housing construction industry—to her projected sales growth rate for the Partnership and show how it provided valid support for her opinion. In particular, she did not explain why she chose that data or address how it supported annual sales increases of 11% to 18% for the Partnership, which had zero growth in sales over the previous four years. She testified that she identified growth because the Partnership was a start-up business and the sales declines in prior years were due in part to a recession. But she also testified that she did not have an opinion about how long the Partnership was a start-up business, conceding that it was standard to consider a business a start-up for three years and that it would be unusual to treat the Partnership—which had been operating for seven years—as a start-up. She testified that when talking about growth, she considered the recession and "gaining back to where [the Partnership] once was prior to." But she was not asked to provide any "objective facts, figures, or data" to support her projections, *Phillips*, 475 S.W.3d at 279, nor to take into account specific

39

"market realities" such as competition in the cement industry or the Partnership's customer base. *See Estate of Sharboneau*, 48 S.W.3d at 184. For these reasons, Miller's opinion regarding sales projections was also conclusory and provided no evidence of damages.

\*     \*     \*

We hold that none of the EMC plaintiffs' evidence was legally sufficient to support the damages awarded. Generally, when we sustain a no-evidence issue after a trial on the merits, we render judgment on that issue. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992). When there is evidence to support some amount of damages, but not all, rendition is not appropriate. *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007). But here, there was no evidence of any damages because the testimony of Lygren and Miller was conclusory, and Swanstrom's testimony of purchase price was no evidence of market value. Because there is no evidence of damages, we reverse the portions of the judgment awarding damages and render a take-nothing judgment.

## IV.     The trial court did not abuse its discretion by denying a permanent injunction.

VHSC next challenges the court of appeals' holding that EMC Cement BV was entitled to a permanent injunction. After the jury found misappropriation of trade secrets, EMC Cement BV sought a permanent injunction against VHSC and Pike, arguing they possessed its trade secrets, had used those trade secrets, and were in a position to continue doing so. The trial court denied the request for a permanent injunction and issued findings of fact and conclusions of law.

The court found VHSC was not currently using any of the claimed trade secrets: it discontinued use of those secrets shortly after the foreclosure sale, removed EMC Cement BV's equipment modifications, and began using different materials and milling equipment. The court

also found that the EMC plaintiffs' evidence of damages was predicated on the market value attributable to future income streams. The court then concluded (1) there was no evidence EMC Cement BV was facing imminent harm, and (2) the final judgment provided EMC Cement BV with an adequate remedy at law, as the actual damages for misappropriation of trade secrets were based solely on future income.

EMC Cement BV filed its own appeal, arguing the trial court abused its discretion by refusing to grant its request for a permanent injunction. The court of appeals agreed. 579 S.W.3d at 424–29. The court first determined that the trial court's findings of fact regarding VHSC's non-usage of EMC Cement BV's trade secrets were not supported by legally sufficient evidence. *Id.* The court then held that when a defendant possesses trade secrets and is in a position to use them, imminent harm is presumed. *Id.* As for the evidence of damages, the court noted the jury was asked about past and not future damages in the charge question pertaining to misappropriation of trade secrets. *Id.* It then cited cases for the proposition that threatened disclosure of trade secrets constitutes irreparable injury as a matter of law. *Id.* The court concluded that because EMC Cement BV satisfied all of the requirements for a permanent injunction, the trial court abused its discretion by denying the request. *Id.* VHSC challenges the court of appeals' holding, asserting that EMC Cement BV failed to establish any of the elements required for permanent injunctive relief.

We review the trial court's refusal of a permanent injunction for an abuse of discretion. *See Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998); *1717 Bissonnet, LLC v. Loughhead*, 500 S.W.3d 488, 500 (Tex. App.—Houston [14th Dist.] 2016, no pet.). To be entitled to a permanent injunction, a party must prove (1) a

wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law. *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 690 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

VHSC asserts that EMC Cement BV failed to prove any of these elements. We conclude that EMC Cement BV failed to demonstrate the lack of an adequate remedy at law.[36]

"A permanent injunction issues only if a party does not have an adequate legal remedy. If there is a legal remedy (normally monetary damages), then a party cannot get an injunction too." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 284 (Tex. 2004).[37] "[A] plaintiff can prove there is no adequate remedy at law where damages cannot be calculated." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004).

VHSC asserts that EMC Cement BV never claimed its trade-secret damages could not be measured by a pecuniary standard; to the contrary, it consistently took the position that it could prove its damages. EMC Cement BV responds that its injury could not be remedied at law because there was no evidence of future monetary damages for the misappropriation of its trade secrets. It points to the damage measures for misappropriation included in the charge, arguing that neither is a measure of future monetary loss. The court of appeals agreed with EMC Cement BV that the jury was asked about past and not future damages in the question regarding misappropriation of trade secrets. 579 S.W.3d at 428.

---

[36] The Texas Uniform Trade Secrets Act now governs injunctive relief and damages available in trade secret cases. TEX. CIV. PRAC. & REM. CODE §§ 134A.003–.004. Because it covers claims accruing on or after September 1, 2013, it is inapplicable to this case.

[37] *See also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 210 (Tex. 2002) ("The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law.").

By focusing solely on the measures themselves, the court of appeals and EMC Cement BV lose sight of how EMC Cement BV sought to prove those measures.

> Damages in misappropriation cases can . . . take several forms, including the value of the plaintiff's lost profits, the defendant's actual profits from the use of the secret, *the value a reasonably prudent investor would have paid for the trade secret, the development costs the defendant avoided by the misappropriation*, and a reasonable royalty.

*Berry–Helfand*, 491 S.W.3d at 710–11 (emphasis added). In this case, the jury was instructed to consider the two italicized measures of damages for misappropriation. Although EMC Cement BV argues that neither measures future monetary loss, the trial court correctly observed that EMC Cement BV used evidence of the market value attributable to future income streams to prove what an investor would have paid for the secrets. Moreover, to prove damages for their other causes of action, the EMC plaintiffs offered expert testimony projecting the Partnership's future lost earnings in order to determine its lost market value. EMC Cement BV could have sought to value its lost profits—also a proper measure of damages for misappropriation—using a similar approach. Accordingly, we conclude EMC Cement BV failed to prove that it had no adequate remedy at law for the misappropriation of its trade secrets. *See Dresser-Rand Co.*, 361 F.3d at 848; *cf. Credit Suisse AG v. Claymore Holdings, LLC*, ___ S.W.3d ___, ___ (Tex. 2020) (holding under New York law that "[a]n adequate remedy at law existed, as evidenced most vividly by the damages case [the plaintiff] itself put before the jury").

Our conclusion that the EMC plaintiffs failed to offer legally sufficient evidence of damages here does not alter this result. The failures of the EMC plaintiffs' experts to take the necessary steps to connect their opinions to supporting data do not establish that no damages could be calculated. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 423 (Tex.

2011) ("[T]he *existence* of a remedy at law . . . foreclosed the availability of . . . an injunction. . . ." (emphasis added)).[38]  The trial court did not abuse its discretion in denying EMC Cement BV a permanent injunction on the ground that it had an adequate remedy at law.  *See id.*

## V.     VHSC was not entitled to judgment on its loan deficiency counterclaim.

Finally, VHSC contends that the court of appeals erroneously failed to render judgment in its favor on a counterclaim against the Partnership for breach of contract.  VHSC alleges that it purchased all of Few Ready Mix's rights to the Partnership's loan, which had a principal balance of $245,777.62 at the time of trial.  VHSC's counterclaim sought payment of the balance.  The jury answered "no" when asked whether the Partnership failed to comply with the note by failing to pay.

In the court of appeals, VHSC asserted the trial court should have granted its motion for JNOV because it had conclusively established its right to recover the deficiency.  The court of appeals disagreed, holding the jury could have based its verdict on bank records reflecting that the note was paid off and its principal balance was zero.  579 S.W.3d at 424.

VHSC advances the same position in this Court, arguing it conclusively established that Few Ready Mix purchased the loan and did not simply pay it off.  In addition to evidence of the loan purchase, VHSC points to statements by the EMC plaintiffs that VHSC claims are judicial admissions that the loan was sold to Few Ready Mix.

---

[38] *See also Dresser-Rand Co.*, 361 F.3d at 848 ("For purposes of injunctive relief, an adequate remedy at law exists when the situation sought to be enjoined is *capable of being remedied* by legally measurable damages." (emphasis added)); *Tanglewood Homes Ass'n v. Feldman*, 436 S.W.3d 48, 77–78 & n.17 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (holding plaintiffs had adequate remedy at law even though damage award was reversed).

We disagree with VHSC's framing of the issue that it is entitled to judgment because it conclusively proved Few Ready Mix purchased the loan. The jury was asked without objection whether the Partnership "fail[ed] to comply with the terms of the NOTE by failing to pay the deficiency balance." "Note" was defined in the charge as "the Promissory Note originally between [the Partnership] and Texas Capital Bank." We must review the sufficiency of the evidence in light of this question and definition. *See Osterberg*, 12 S.W.3d at 55.

As previously noted, when considering a no-evidence challenge, we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not. *Wilson*, 168 S.W.3d at 827. The note contained the following provision: "**Deficiency**. In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral by Bank are insufficient to pay all amounts to which Bank is legally entitled, Borrower and any Obligated Party shall be liable for the deficiency, together with interest thereon as provided in the Loan Documents." Phillip Wood, the former executive vice president of Texas Capital Bank, explained that a deficiency occurs when a payment is made on a loan but there are not adequate funds to satisfy the entire obligation. Wood also testified that two wire transfers from Walker and Wilson came to the bank, and both listed the beneficiary as the Partnership. The bank ledger reflected that after the second payment, the principal balance was $0.

Viewing this evidence in the light most favorable to the verdict, we disagree that VHSC conclusively proved it was entitled to judgment on its counterclaim. Given the jury charge's definition of the note, the note's definition of deficiency, and the evidence that the balance on the note was zero, there was more than a scintilla of evidence that the Partnership did not fail to comply

45

with the terms of the promissory note originally between it and Texas Capital Bank by failing to pay the deficiency balance. We affirm the court of appeals' judgment regarding the counterclaim.

## VI.     Disposition of remaining claims

The trial court ordered Walker and Wilson to pay attorneys' fees to EMC Cement BV based on their failure to comply with the partnership agreement. *See* CIV. PRAC. & REM. CODE § 38.001(8) (providing that a person may recover reasonable attorneys' fees in addition to the amount of a valid claim in a claim for breach of contract). Because we have held that the evidence of actual damages is insufficient, we must also reverse the award of attorneys' fees. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004) (per curiam) (holding party was not entitled to recover attorneys' fees because it was not awarded damages on its claim for breach of contract). Further, because we have concluded the EMC plaintiffs failed to present legally sufficient evidence of damages, we need not address any remaining issues.

### CONCLUSION

We affirm the court of appeals' judgment with respect to VHSC's loan deficiency counterclaim. We reverse the judgment in all other respects and render judgment that the EMC plaintiffs take nothing.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** June 19, 2020

46

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below:

Envelope ID: 43906794
Status as of 06/22/2020 13:58:13 PM -05:00

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Richard B.Phillips, Jr. | | rich.phillips@tklaw.com | 6/19/2020 6:04:50 PM | SENT |
| Denise Stilz | | denise.stilz@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Charles T.Frazier | | cfrazier@adjtlaw.com | 6/19/2020 6:04:50 PM | SENT |
| Michelle Meuhlen | | michelle.meuhlen@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Robin Hart | | robin.hart@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| James Michael Heinlen | 24032287 | Michael.Heinlen@tklaw.com | 6/19/2020 6:04:50 PM | SENT |
| Nina Cortell | 4844500 | nina.cortell@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Charles Alfred Mackenzie | 12761550 | amackenzie@texas-appeals.com | 6/19/2020 6:04:50 PM | SENT |
| Angus Earl McSwain | 13861100 | mcswain@thetexasfirm.com | 6/19/2020 6:04:50 PM | SENT |
| Steven Gregory White | 21329050 | gwhite@grayreed.com | 6/19/2020 6:04:50 PM | SENT |
| Mark Ryan Trachtenberg | 24008169 | mark.trachtenberg@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Herbert J. Hammond | 8858500 | Herbert.Hammond@tklaw.com | 6/19/2020 6:04:50 PM | SENT |
| Joshua John White | 24048880 | JWhite@haleyolson.com | 6/19/2020 6:04:50 PM | SENT |
| Craig David Cherry | 24012419 | ccherry@haleyolson.com | 6/19/2020 6:04:50 PM | SENT |
| Andrew Guthrie | 24078606 | andrew.guthrie@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Allen Paulsen | 24060397 | ryan.paulsen@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Benjamin Lee Mesches | 24032737 | ben.mesches@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Scott Stolley | | Scott.Stolley@tklaw.com | 6/19/2020 6:04:50 PM | SENT |
| Mike Hatchell | | mike.hatchell@haynesboone.com | 6/19/2020 6:04:50 PM | SENT |
| Natalie Cooley | | natalie.cooley@tklaw.com | 6/19/2020 6:04:50 PM | SENT |
| Ashley Dekle | | dekle@thetexasfirm.com | 6/19/2020 6:04:50 PM | SENT |